199 So.2d 238 (1967)
AETNA LIFE INSURANCE COMPANY, Defendant-Appellant,
v.
George Stanley EVINS, Plaintiff-Appellee.
No. 44466.
Supreme Court of Mississippi.
May 29, 1967.
Elizabeth Hulen, Watkins & Eagar, Jackson, for appellant.
Lancaster, Baxter & Seale, Tallulah, La., Teller, Biedenharn & Rogers, Vicksburg, for appellee.
PATTERSON, Justice:
This appeal is prosecuted by Aetna Life Insurance Company from a judgment non obstante veredicto of the Circuit Court of the First Judicial District of Hinds County entered after a trial jury had returned a verdict for Aetna and against the insured appellee, George Stanley Evins.
*239 Evins had brought suit for benefits under a policy of health and accident insurance issued by Aetna. The policy provided for monthly benefits of $200 for total disability from sickness. It was issued on May 2, 1962, and by November 1962 appellee had become totally disabled from multiple sclerosis.
The policy called for payment of benefits for five years. Aetna paid benefits for one year and stopped further payments on the ground that a rider attached to the policy contract limited indemnity to twelve months for total disability "resulting from any affection of the brain."
In his January 1962 application for insurance, Evins noted that he previously had been treated for a brain concussion. Aetna's medical director, Dr. John O. Alden, sent a "Skull Questionnaire" regarding the injury to Evins' attending physician, Dr. Frank Padberg. Aetna issued the policy on May 2, 1962, with the following rider attached.
IMPAIRED CONDITION COVERAGE RIDER
In consideration of the payment of the special class premium stated below, it is hereby agreed that:
1. Part II of this Policy entitled "Total Disability", as it pertains to Sickness, is modified so that in no event shall the maximum period for which monthly indemnity is payable for any one period of total disability resulting from any affection of the brain exceed 12 months.
2. No claim for benefits under this Policy on account of loss resulting from accidental bodily injuries sustained or from sickness contracted and commencing on or after the effective date of the Policy shall be reduced or denied on the grounds that the Insured contracted or suffered from brain disorder before the Policy Date, except as stated in this Rider.
3. The special class 1 Month premium is $1.52 which is included in the premium stated in the Policy.
Both appellant and appellee requested and were refused peremptory instructions.
Appellant assigns as error the circuit court's action in setting aside the jury verdict and entering judgment for appellee notwithstanding the verdict of the jury, and in failing to grant appellant a directed verdict.
It is Aetna's contention that the rider was attached, not because of Evins' April 1960 brain concussion, but because of Dr. Alden's recommendation, which he said was prompted by the bizarre neurological symptoms reported by Dr. Padberg in the questionnaire.
The appellant argues that there was not only ample evidence to sustain a verdict for the defendant, but that the great weight of the evidence was to the effect that the appellee was totally disabled from an affection of the brain and that this was a jury issue.
The appellee maintains that the policy provided coverage for disability resulting from the disease of multiple sclerosis for a period of five years and that the "impaired condition coverage rider" which reduces the indemnity period when disability results from "brain affection" is not applicable. He contends that multiple sclerosis is a spontaneous disease of unknown origin and this disease resulted in the disability suffered by appellee; that multiple sclerosis is not produced by an "affection of the brain" and that under the policy the producing and responsible cause of the disability is the determinative factor. He contends, apart from the foregoing, that the evidence conclusively shows that appellee was totally disabled due to nerve damage in his spinal cord resulting from multiple sclerosis independent of "any affection of the brain."
The parties admit and the evidence reflects that the appellee is totally disabled from multiple sclerosis.
*240 This disease was defined by Dr. Alden, an assistant medical director for the appellant, in his deposition, as being "an affection of the brain." This definition was not elaborated upon by question or answer to determine if the disease also included the spinal cord.
Dr. Robert Currier, a neurologist and witness for the appellant, defined multiple sclerosis as follows:
This is a disease of the central nervous system, the brain and the spinal cord, of unknown cause, but due to defects in the myelin coverings of the central nerves, the nerves in the brain and the spinal cord. These coverings normally, most people believe, act like insulation, and once these coverings deteriorate or degenerate, then the nerve fibers that go through the coverings don't work any more, so you have areas of poor function of the body that is run by these parts of the nervous system. It's a demyelinating disease, if that explains anything.
He defined the brain as being that part of the central nervous system contained within the skull, which includes the cerebral hemispheres, the cerebellum, and the brain stem.
Dr. Richard W. Naef, a neurologist and witness for the appellee, testified that no one knows the actual cause of multiple sclerosis. "It gets its name because there are multiple areas of scarring. * * * There is no other disease process which you might term an affection of the brain which causes multiple sclerosis. Multiple sclerosis is a spontaneous disease of itself, not coming from any other disease or any affection of the brain," and "It involves the central nervous system." Later he testified that the central nervous system consists of the brain and the spinal cord.
Multiple sclerosis is defined as:
A disease of the brain and spinal cord. The spinal cord is the "cable" of nerves in the spinal column. In this condition, various parts of the brain and spinal cord are subjected to a type of deterioration called sclerosis. (Schmidt, Attorneys Dictionary of Medicine and Word Finder (1965).
and
A demyelinating disease involving the central nervous system. By "demyelination" is meant that there is a loss of the myelin insulating sheaths about the nerve fibers in the tract of the brain and spinal cord. (3 Gray, Attorney's Textbook of Medicine, Sec. 88.68(4) 1965).
The record reflects the following uncontroverted facts: (1) the issuance to the insured of the policy with the attached rider which excludes disability payments for a period longer than 12 months when such disability results from "any affection of the brain," and (2) the disability of the insured from multiple sclerosis, the same having become manifest after the issuance of the policy.
The primary question to be determined is whether the exclusionary provision of the rider is limited to an affection of the brain, meaning a disease of that organ which is located within the skull, or whether the language thereof is broad enough to exclude coverage for a disability resulting from a disease of the central nervous system which is composed of both the brain and the spinal cord. The rider did not exclude multiple sclerosis by name or specific description although the rider was attached, as contended by appellant, as the result of the bizarre neurological symptoms (headaches, altered coordination, and weakness of the right leg) reported to it in the questionnaire at the time of the issuance of the policy.
Under the undisputed evidence, an "affection" of the brain is the same as a disease of the brain. It is difficult to define precisely what is meant by "any affection of the brain" as it is descriptive of a class or group of diseases relating to the brain, but without limitation as to whether it is exclusive thereto (again meaning the brain located *241 within the skull capacity) or whether it includes an affection or disease of the brain which also is related to other parts or organs of the body. We are of the opinion that the term could logically be construed to either include other organs of the body or to exclude them, and being susceptible of different constructions, it is ambiguous.
The policy and the attached rider were prepared by the appellant insurance company and in accordance with familiar principles of law, if the provisions of the policy are of doubtful meaning, they must be construed most strongly against the insurer and liberally in favor of the insured in order that the purpose of the policy will not be defeated. American Hdw. Mutual Ins. Co. v. Union Gas Co., 238 Miss. 289, 118 So.2d 334 (1960); Lumbermen's Mutual Casualty Co. v. Broadus, 237 Miss. 387, 115 So.2d 130, 74 A.L.R.2d 1248 (1959); Interstate Life and Accident Co. v. Waters, 213 Miss. 265, 56 So.2d 493 (1952) and Southern Home Ins. Co. v. Wall, 156 Miss. 865, 127 So. 298 (1930).
We are of the opinion that the phrase "any affection of the brain" used in the rider did not exclude a disability resulting from multiple sclerosis if in fact disability resulted from such disease apart from the brain.
Regarding this question, Dr. Naef was asked:
Q. One question. Dr. Naef, if this gentleman's brain wasn't affected at all, if there was no affection of the brain whatsoever, would he still be disabled in your opinion because of the spinal cord involvement?
A. I think he probably would be. I've seen people, many, and I think all of us who have seen multiple sclerosis will see people who are disabled with spastic weakness and poor coordination and sensory impairment, and so forth, due to just spinal cord damage. Now, I cannot say that all of his  well, let me put it another way. I cannot say that if you took away the brain damage itself he would be totally disabled, but I think it is most likely he would, because he has manifestations of spinal cord damage.
Q. In your opinion most likely he would be?
A. Yes, sir.
Dr. Currier, though not as positive in his response to similar questions, replied thereto as follows:
Q. I'm not doubting it, I'm just going by what you said, if you could theoretically eliminate one, he'd still have ataxia from the spinal cord?
A. It's possible.
Q. Well, so far as you know he would have it, wouldn't he, he would be disabled, wouldn't he?
A. He would probably be disabled, but I'm not sure it would be from his ataxia. The main disability that he has is from what's called peranimal tract disease. this is the main motor pathway down through the brain into the spinal cord.
Q. Just let me see if we are not correct about this. The multiple sclerosis is the disease which causes other disastrous results to the body?
A. Yes, sir.
Q. And in causing them it causes involvement in some cases and to a certain extent to parts of the brain, the brain stem or cerebellum?
A. Yes, sir.
Q. In causing these same disastrous results it causes damage to the spinal cord?
A. Yes, sir, it usually does.
Q. And in his instance in your opinion he does have damage to the spinal cord?
A. He probably does.

*242 Q. You have expressed that opinion, have you not?
A. Yes, sir.
Q. And if there were such a thing as theorizing that there was no damage whatsoever, if this disease hadn't even caused any damage to the brain, this gentleman by reason of the damage it has caused to the spinal cord would be independently through that cord, the spinal cord, would likely be disabled, would he not?
A. I guess so, I don't know. It's a matter of guesswork as to how he would be if he didn't have other involvement than his spinal cord involvement.
From this medical testimony we are of the opinion that the damage to the appellee's spinal cord is sufficient, independent of the brain damage, to result in his disability. We are concluded to the foregoing statement by the testimony of medical specialists, as was the lower court, in view of Kramer Service v. Wilkins, 184 Miss. 483, 489-499, 186 So. 625, 628 (1939), wherein we stated as follows:
And the medical testimony is conclusive on both judge and jury in this case. That testimony is undisputed that after long and anxious years of research the exact cause of cancer remains unknown  there is no dependably known origin to which it can be definitely traced or ascribed. If, then, the cause be unknown to all those who have devoted their lives to a study of the subject, it is wholly beyond the range of the common experience and observations of judges and jurors, and in such a case medical testimony when undisputed, as here, must be accepted and acted upon in the same manner as is other undisputed evidence; otherwise the jury would be allowed to resort to and act upon nothing else than the proposition post hoc ergo propter hoc, which as already mentioned, this Court has long ago rejected as unsound, whether as evidence or as argument.
In all other than the exceptional cases now to be mentioned, the testimony of medical experts, or other experts, is advisory only; but we repeat that where the issue is one which lies wholly beyond the range of the experience or observation of laymen and of which they can have no appreciable knowledge, courts and juries must of necessity depend upon and accept the undisputed testimony of reputable specialists, else there would be no substantial foundation upon which to rest a conclusion. 22 C.J. pp. 730, 731; Moratzky v. Wirth, 74 Minn. 146, 148, 76 N.W. 1032; Ewing v. Goode, C.C., 78 F. 442. Thus in Berryhill v. Nichols, [171 Miss. 769, 158 So. 470], supra, which dealt with a case of pulmonary embolism, and of which a jury could have no knowledge whatever except as conveyed to them by medical experts, the action of the court in granting a peremptory instruction on the medical testimony was upheld as correct, and a like course was taken by this Court in Mutual, etc., Association v. Johnson, [186 So. 297]. See also, as somewhat in point, the cancer case, Schapiro v. Wanamaker, 197 App.Div. 810, 189 N.Y.S. 343.
We are of the opinion there was no question of fact to be determined by the jury and that the trial court should have granted appellee's peremptory instruction at the conclusion of all the evidence. It correctly sustained the motion for a judgment notwithstanding the verdict of the jury, as the medical testimony was conclusive upon the judge as it was wholly beyond the range of the common experience of lay jurors and left no facts to be determined by them.
Affirmed.
RODGERS, INZER, SMITH and ROBERTSON, JJ., concur.