AMERICA SOUTHWEST CORPORA-
TION, Plaintiff,

v.

UNDERWRITERS AT LLOYDS,
LONDON, Defendant.

Civ. A. No. 4760.

United States District Court,
S. D. Mississippi,
Jackson Division.

Oct. 27, 1971.

Alex A. Alston, Jr., Thomas, Price, Alston, Jones & Davis, Jackson, Miss., for plaintiff.

Junior O'Mara, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., Clarence A. Frost, Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for defendant.

## MEMORANDUM OPINION

NIXON, District Judge.

On November 23, 1967 Gulf Coast Drilling and Exploration Inc., a corporation, which by merger on June 18, 1970 became known as America Southwest Corporation (both of which shall hereinafter be referred to as plaintiff), was issued insurance policies designated as an "Oil & Gas Well Drilling Tool Floater" by Underwriters at Lloyds, London [1] and by the Institute of London Underwriters Companies [2] insuring plaintiff's drilling Rig No. 2 in the respective percentages of 66.25% and 33.75%, for a total value of an amount of $427,300, evidenced by a Certificate of Insurance issued to plaintiff by Marion L. Martin & Company, International Underwriters of Houston, Texas,[3] on December 28, 1966 which coverage became effective on December 1, 1966 and ended at midnight on November 30, 1969 for a period of 36 months. The above policies and certificate evidencing them covered the above designated oil well drilling equipment of the plaintiff known as Rig No. 2 against "direct loss or damage" by various named perils.

On July 30, 1969, while the above policies were in full force and effect, the following described accident occurred causing damage to the insured equipment and resulting in this suit by the plaintiff for recovery following the defendant's denial of coverage.

---

1. Exhibit P-2.
2. Exhibit P-3.
3. Exhibit P-1.

In accordance with the stipulation of the parties the Court finds that there are two issues involved in this suit, namely (1) whether these policies afford coverage to the plaintiff for the accident which occurred, and if so, (2) the amount and extent of the resulting damages which plaintiff is entitled to recover as a direct result thereof.

Paragraph 3(1) which is typed in the Certificate of Insurance issued by Marion L. Martin & Company (Exhibit P–1) is determinative of the coverage question. This paragraph reads:

"3. This Certificate insures against direct loss or damage by:

(1) Raising, lowering, pull-in or collapse, meaning loss or damage caused by collapse due to pull-in."

Therefore, the question for determination is whether the particular accident and damages resulting therefrom were included as an insured peril, inasmuch as the parties apparently agree with this Court's conclusion that nowhere in the policies is there a specific exclusion of the accident that occurred.[4]

The principal or major parts of the insured drilling rig and derrick were: (1) a very substantial foundation resting and stabilized on four legs and capable of supporting 1,000,000 pounds; (2) a heavy steel substructure or derrick floor approximately 14 to 18 feet above ground level with heavy raised 18 inch steel supporting beams beneath; (3) a rotary table which was fit into the derrick floor and pinned on two sides of the substructure, having a strength capable of raising the 142 foot mast to its full height with the assistance and use of an A-frame; (4) a "monkey board" or steel platform located approximately 40 to 50 feet above the "monkey board" at the top of the mast which contained "sheaves", the function of which were to turn and pull the pipe in and out of the hole. A successful drilling operation could not be performed without any one of the above principal and integral parts.

The accident and resulting damages in question occurred on July 30, 1969 after plaintiff's derrick and rig had been on location and operating for approximately 60 days while drilling for Shell Oil Company in the Goodwater Field of Clark County, Mississippi. Wilton Bryant, the "morning tour driller" with five years experience in his particular job was pulling the pipe out of the ground from a depth of approximately 13,696 feet, where "fishing operations" had been conducted, in order to attach a "bit", go back into the hole and commence drilling. Bryant had pulled 32 stands of pipe, each of which was 92 to 95 feet long, out of the hole and while pulling the 33rd stand he mistakenly thought that he was pulling the third joint (each joint consisting of three pipes tied together), but was actually pulling the fourth from the hole. This error resulted in the "traveling block", which weighs approximately 18,000 pounds and moves up and down the derrick pulling pipe in and out of the hole, being pulled into and against the "crown block" at the top of the derrick. The drawworks continued in operation after the steel traveling block was pulled into and against the steel crown block spooling and breaking the drill line, which was capable of pulling 600,000 pounds of weight out of the ground, which resulted from great and intense pressure being exerted against the crown block by the traveling block. This force and pressure caused severe damage to three "sheaves" of the crown block and the 8' × 8' oak crown bumper blocks or sills, designed to protect the crown block, were crushed. In addition, the heavy traveling block was broken into pieces, and it, together with the crushed bumper sills fell to the derrick floor, breaking or dam-

4. On cross examination of the only witness called by the defendant, Douglas Scott Henderson, an employee of an independent appraisal and adjustment firm employed by the defendant and who was of the opinion that the above policy provision did not cover the loss in question stated that his opinion is based on a lack of inclusion of coverage of the accident in question as an insured peril rather than any exclusion thereof under the terms and provisions of the policies.

aging the "monkey board" on the way down. In addition, the "elevators" and "elevator beds", each of which weighed 600 pounds and were used to latch onto pipe in order to pull it out of the hole, also fell to the derrick floor together with the drill pipe, some of which was "pinched" and thrown out from the rig. Approximately 11,000 feet of pipe (600 feet of this 11,000 feet consisting of 22 "drill collars" of solid steel used to keep the weight on the drill and maintain the plumb bob straight) of a total weight of approximately 2,000 pounds fell back into the hole, was severely bent and stuck therein. This pipe later had to be "fished out" or salvaged and straightened joint by joint. When the pipe fell it also struck the rotary on the rig floor damaging some of the roller bearings therein.

The tremendous force of the above heavy falling objects collapsed the substructure of the derrick causing two of its four legs to collapse, and the entire drilling rig was severely damaged as a direct result of the above accident.

As previously stated, the plaintiff contends that the above accident was a peril insured against in Paragraph 3(1) of the Certificate of Insurance Coverage (Exhibit P–1) inasmuch as it constituted a "loss or damage caused by the collapse due to pull-in". On the other hand, the defendant asserts that the questioned provision of the Certificate of Insurance covers only collapse of the mast or derrick itself caused by a pull-in, as is evidenced by the testimony of their only witness, Douglas Scott Henderson, who was employed by Rush Johnson & Associates, independent appraisers, and who appraised this damage in question during the first week of August, 1969, recommending denial of coverage because "there was no pull-in of the mast or derrick." In his opinion there would be no coverage unless there was a complete or partial destruction of the derrick resulting in its falling over or completely collapsing, although he admitted that neither the word "derrick" nor "mast" appears in the disputed policy provision.

The rights and liabilities of these parties are determinative from a proper construction of the written insurance contracts of the defendant which were carefully and meticulously prepared to cover a very selective risk. Neither the word "derrick" nor "mast" appears in the disputed coverage provision. Considering this policy provision in its light most favorable to the defendant, the best that can be said is that the coverage provision of Paragraph 3(1) is ambiguous. As was stated by the Fifth Circuit in Freeman v. Continental Gin Company, 381 F.2d 459, 463 (C.A. 5, 1967):

> "Whether or not the 'parole evidence rule' is properly regarded as a rule of evidence it is settled that for purposes of the Rules of Decision Act, 28 U.S.C. § 1652, a federal court in a diversity case must apply the rule as the state court would. Sperry Rand Corp. v. Industrial Supply Corp., 337 F.2d 363, 371 (5 Cir., 1964); 2B Barron & Holtzoff, Federal Practice and Procedure § 962, p. 220 (Wright ed. 1961). * * *"

> "Mississippi recognizes the common exceptions to the 'parole evidence rule.' Three of these are discussed in the *Valley Mills* case, quoted above. Extrinsic evidence will be admitted to show the intent of the parties if the written instrument is ambiguous or indefinite. 145 So.2d at 702."

In Valley Mills, etc. v. Southeastern Hatcheries of Miss., Inc., 245 Miss. 71, 145 So.2d 698 (1962), the Mississippi Supreme Court held that testimony which does not add to, contradict, vary or change the legal import of a contract is admissible where it is offered to explain or assist in construing the document, and that the Court has consistently followed the "parole evidence rule" where it has been applicable to the facts shown in a particular case.

In conformance with the above established rule, this Court permitted testimony to be offered by both sides, including the testimony of experts, to explain or construe the words "pull-in"

and "collapse" in the customary terminology of the oil and gas industry and the jargon of oil-well drilling crews. The Court reserved ruling on the objection made by the defendant to this type testimony of A. J. Pryor, Jr., plaintiff's Executive Vice-President, and that objection is hereby overruled.

Nowhere within the policy in question is the term "pull-in" or the term "collapse" defined, and nowhere within the policy is there any requirement that there be partial or complete destruction of the derrick or its toppling over as a prerequisite to coverage. Furthermore, accidents of the type which occurred herein are not specifically excluded from coverage.

Immediately after the accident occurred on July 30, 1969, the defendant's driller in charge of the working crew filled out his Daily Drilling Report [5]. In the section entitled "Details of Operations in Sequence and Remarks" he wrote "pull in crown and broke drill line".

█ Both plaintiff's Executive Vice-President, Andrew J. Pryor, Jr., who received his Bachelor of Science degree in geology from the University of Houston in 1953, did post-graduate work thereafter, and has been in the oil and gas business since that time, and plaintiff's expert M. E. Norman [6] who received his Bachelor of Science degree in geology in 1929, worked on his Masters degree thereafter, and who is vice-president of and an independent consultor for a company not related to the plaintiff corporation and who has been in the oil business for forty years, stated that the accident in question constituted a "pull-in" and a resulting "collapse". It was their opinion, and this Court finds, that the accident which occurred as well as several other possible accidents or events would constitute a "pull-in" or "collapse" within the coverage provision of Paragraph 3 (1). This Court finds, in accordance with their testimony, that the crown block, the bumper board which constituted a part thereof, as well as the monkey board and substructure, all of which were extensively damaged, constitute necessary and integral parts of the derrick itself; that a "pull-in" of the line caused a "collapse" of these integral parts of this derrick inasmuch as a "collapse", within the oil and gas industry terminology or jargon can be caused by sufficient force from below as well as from above. Cogent and convincing testimony and the preponderance of the evidence in this case convinces this Court that there was a "collapse due to pull-in" and thus coverage.

Although a policy of insurance must be construed and applied as written, it must receive a fair and reasonable construction to fully cover its intended purpose under all the facts and circumstances. This policy which was carefully prepared by the defendant does not reflect or indicate the restricted and limited coverage which the defendant urges, and nowhere does the policy state that the words "pull-in" or "collapse" refer only to the mast or derrick or that there must be a complete collapse of or toppling as a prerequisite to recovery.

█ The established rule in the State of Mississippi where this accident occurred is that any ambiguity in the language of an insurance policy will be construed more strongly against the writer, or party drafting the contract, and most favorably to the policy holder. Home Owners Insurance Company v. Keith's Breeder Farms, Inc., Miss., 227 So.2d 293 (1969); Caldwell v. Hartford Accident & Indemnity Co., 248 Miss. 767, 160 So.2d 209 (1964); Canal Insurance Co. v. Howell, 248 Miss. 678, 160 So.2d 218 (1964). In the *Home Owners* case, the Mississippi Supreme Court at pages 295–296 of 227 So.2d succinctly stated the rule as follows:

"We think the language of the policy was clear and unambiguous when construed in the context of the nature and long-continued customs of the poultry

---

5. See Exhibit P–4.

6. See this witness' qualifications in Exhibit P–11.

business, but even if it were not, the insurer could gain no comfort from indefinite, uncertain and ambiguous language because the rule is that any ambiguity in the language of the policy will be construed more strictly against the writer of the policy.

"This rule was well and succinctly stated in Caldwell v. Hartford Accident and Indemnity Co., 248 Miss. 767, 160 So.2d 209 (1964):

'The rule that the insurance policy prepared by the insurer must be construed more strongly against the insurance company, and that any fair doubt should be resolved in favor of the insured, is so well-settled in the law of insurance that we hesitate to cite any cases. See Penn v. Commercial Union Fire Insurance Company of New York, 233 Miss. 178, 101 So.2d 535, 67 A.L.R.2d 1238. It is equally well-settled that when the provisions of an insurance policy are subject to two interpretations equally reasonable, that interpretation which gives greater indemnity to the insured will prevail. Penn v. Commercial Union Fire Insurance Company of New York, supra.'
Id. at 776–777, 160 So.2d at 212–213."

The United States Court of Appeals for the Fifth Circuit recognized the above Mississippi rule in an opinion by Judge Coleman in New Orleans Furniture Mfg. Co. v. Great American Insurance Company, 413 F.2d 1278, 1280 (C.A. 5, 1969), which involved a coverage question of a fidelity insurance policy. The Court stated:

" * * * Secondly, the Supreme Court of Mississippi has repeatedly held that if the terms of an insurance policy are reasonably susceptible to two interpretations, the one sustaining indemnity must prevail, e. g., Aetna Life Insurance Company v. Evins, Miss., 199 So.2d 238 (1967)."

Also, the United States District Court for the Northern District of Mississippi in Aerial Agricultural Service of Montana, Inc. v. Till, 207 F.Supp. 50, 57 (N.D.Miss.1962) more fully stated the applicable Mississippi rule in construing ambiguous provision of an insurance policy:

"As will be demonstrated, the insuring language with which we are primarily concerned is confusing in its meaning and thus ambiguous. In this situation, the general rules of almost universal application for the construction of language in insurance policies come into play. In recognition of the fact that insurance policies are almost always prepared completely by the insurer and that the insured has little, if any, voice in their preparation, such contracts are to be strictly construed against the insurer and liberally construed in favor of the insured so that ambiguous words will be interpreted against the insurer to extend or broaden coverage and so a policy susceptible of two reasonable interpretations will be construed favorably to the insured. That is the law in Mississippi (cases cited are omitted).

\*      \*      \*      \*      \*      \*

" * * * It has also been said in a case involving aircraft coverage that 'what controls is not the interpretation of individual words which are not defined in the policy itself, but the interpretation which the ordinary man would give to the phrase as a whole taken in the context of the whole policy and the average man's knowledge of the way insurance is set up.' Prudential Insurance Co. of America v. Barnes (9 Cir. 1960), 285 F.2d 299. And, where 'the critical words [of an insurance policy] are ambiguous to the lay mind, "the insurer may not escape liability merely because his or its interpretation should appear to us a more likely reflection of the intent of the parties than the interpretation urged by the insured. The latter has to be no more than one which is not itself unreasonable." '

Thomas v. Continental Casualty Co. (10 Cir. 1955), 225 F.2d 798."

Considering all of the evidence in this case and applying the above well-settled law of the State of Mississippi concerning the construction of ambiguous language contained in an insurance policy prepared by an insurer, this Court finds and is of the opinion that the evidence preponderates in favor of coverage of the damages resulting from this accident of July 30, 1969 as an insured risk or peril when the defendant's policy was in full force and effect, and with all requirements for coverage in the policy fully satisfied.

Having found that coverage does exist under these insurance policies, it is now necessary to determine the amount of damages to which the plaintiff is entitled. It contends that it has suffered damages in the amount of $92,486.11. Alternatively and utilizing separate but relating formulas for recovery, the plaintiff claims damages in the amounts of $79,-781.11 and $61,081.27. On the other hand, it is the contention of the defendant that the plaintiff's net loss is only $16,896.00.

The primary disagreement between the parties on the amount of recovery herein is whether the "loss of use" of the premises during the period of repair and salvage operations is a proper element of damages under the provisions of the policy and the applicable law. The plaintiff contends that the word "direct", as found in Paragraph 3 of the Insurance Certificate which insures against "all direct loss or damage" from any of the insured perils, means any loss proximately caused by the insured peril as distinguished from any remote loss. Accordingly, the plaintiff thus claims that the loss of use of the rig during the repair and salvage period, totalling 33 days, was proximately caused by the insured peril and that it is therefore entitled to recover the total day rate or rental value of its rig during this period. Alternatively, the plaintiff seeks to recover its actual operating expenses during the repair and salvage period, either as a separate item of recovery or apportioned between the seven days required to repair the rig and the 26 days involved in the salvage operations. The second alternative would reduce the amount of recovery by approximately $19,000 because the plaintiff is entitled to recover only a portion of the salvage expense in accordance with a salvage formula prescribed by the policies.[7]

The defendant contends, however, that coverage is provided only for loss or damage to the plaintiff's Rig No. 2 caused by perils specified in the policies, and that claims for lost profits and other fixed or recurring charges require separate "business interruption" or "loss of use" insurance coverage. It is thus the defendant's position that the plaintiff is limited in recovery to the actual expenditures for repairs to the rig and for a portion of the salvage cost as computed pursuant to the salvage formula.

■ After carefully examining the terms and provisions of the insurance policies herein, this Court is of the opinion that no coverage is afforded thereunder for any "business interruption" or "loss of use" of the premises during the period of repair and salvage operations. The law is clear that those items of damage falling within the ambit of "business interruption" or "loss of use" insurance are not covered by general property insurance policies of the type under consideration herein. Appleman, in his

---

7. The Salvage Expense Clause, Article 11 of the policies, provides:

"Salvage Expense Clause: (applicable only to drill stem, below surface). It is agreed that should drill stem below the surface become stuck as the direct result of an insured peril, the liability of the Underwriters to salvage expense (excluding all mud and cement expenses) shall be limited to that proportion of such expense actually expended by the oil operator(s) or by the Assured or by both that the value of all drill stem below the surface bears to *the direct cost of drilling the well* to the attained depth plus the value of said drill stem. In no event shall the Underwriter's liability under this Clause exceed the value of the drill stem below the surface at the time loss occurs." (Exhibit P–1—3).

comprehensive treatment of insurance law, states:

"The loss of use of the premises is a separate interest which may be specifically insured, but which is not covered by general property loss or damage, fire or marine insurance policies. To cover this area, use and occupancy and business interruption coverages have been written; these are forms of property insurance, often part of fire coverages, against indirect loss or damage to the property caused by an insured risk. Conversely, such an endorsement would not cover direct losses such as 'raw stock' in the insured building and other items coming under the classification of contents.

"The terms 'use and occupancy coverage' and 'business interruption coverage' have often been used interchangeably by the Courts, and even, at times, by insurance companies, both have been considered to be designed to do for the insured in the event of business interruptions just what the business itself would have done if no interruption would have occurred." [8]

Likewise, the general rule as stated in C.J.S. is as follows:

"Earnings, rents, profits of business, or other such losses as may result from the destruction of property insured constitute separate interests and are not to be taken into account as a part of the damages under a policy covering the property only. Where, however, earnings, rents, profits, or the value of the use of the property are separately insured, the actual loss sustained in this respect may be recovered, as determined under, and within the limits laid down by, the provisions of the policy." [9]

The case of Stanley v. Onetta Boat Works, Inc., 303 F.Supp. 99 (D.Or., 1969), affd. 9 Cir., 431 F.2d 241 (1971), cited by the plaintiff in support of its contention that the loss of use of the premises is a proper item of recovery is distinguishable on the ground that the policy under consideration therein was an "All Risk" insurance policy. The District Court construed the policy to create a special type of coverage extending to risk not usually covered by other policies and allowing recovery on all fortuitous losses which were not expressly excluded from coverage by a specific provision of the policy.

The testimony of Andrew J. Pryor, Jr., vice-president of the plaintiff company, reveals that at the time of this accident, Rig No. 2 was engaged in drilling a well for Shell Oil Company for which the plaintiff was being paid a day rate of $1,635 for the use of the rig.[10] Pryor testified that the daily cost or average operating expenses in the drilling of a well, which consists of labor, insurance, wire lines, depreciation and other administration expenses, is normally between $1,300 and $1,400 per day. He further stated that the $1,635 Shell paid per day for rental of the rig yielded a daily profit of about $400 and the operating expenses for this rig would thus be approximately $1,250 per day.

Initially, it is clear that this Court's interpretation of the provisions of the policies would not allow any recovery for the $400 per day loss of profits incurred during the repair and salvage period. Secondly, this Court is of the opinion that any recovery in this regard must be apportioned between the seven days required for the repairs and the remaining 26 days of salvage operations.

The plaintiff contends, however, that it is entitled to recover the entire normal daily operating expenses for Rig No. 2, $1,250 per day, apportioned between the repair and salvage operations, because it was necessary for crews to be present and for the other administrative expenses to continue each day of the repair and

---

8. 4 Appleman, Insurance Law and Practice, § 2329.

9. 45 C.J.S. Insurance § 920; 44 Am.Jur. 2d, Insurance, § 1653.

10. The Court reserved ruling on defendant's objection to this line of testimony and now specifically overrules that objection.

salvage period. On the other hand, the defendant contends that the plaintiff is only entitled to recover wages of certain crewmen incurred on those work tours during which the repair and salvage operations were being conducted. This would exclude recovery for all so-called "fixed" or "recurring" expenses such as the salaries of supervisory and office personnel, insurance, utilities, and all other normally incurred administrative or operating expenses. Utilizing this approach, the plaintiff's recovery for this element of damage would be limited to an average of approximately $250 per day for the repair operations and $400 per day for the salvage operations, as reduced by the application of the salvage formula.

This Court is of the opinion that the position of neither party is fully accurate in regard to the assessment of allowable expenses during the repair and salvage period. The plaintiff is not entitled to recover the entire daily operating expenses as computed for normal daily rig operations because this would include expense items not directly related to the repair and salvage operations and recoverable only under "loss of use" or "business interruption" insurance policies. In this Court's opinion, however, certain operating expenses, or portions thereof, over and above the wages paid the drilling crews are recoverable as expenses directly related to the repair and salvage operations. This is not a case in which the normal drilling operations continued while the repair and salvage operations were being performed. The entire effort of the plaintiff during this period was directed toward the accomplishment of the repair and salvage of rig equipment in order that normal operations could be resumed.

It is of course extremely difficult and perhaps impossible to precisely determine each item of normal operating expense, or the portion thereof, which was directed toward the repair and salvage operations. Nevertheless, a fair and equitable remedy herein necessitates an allowance for operating expenses over and above the wages paid the drilling crews. This Court is thus going to increase the recoverable operating expenses over and above the wages paid to drilling crews during the repair and salvage operations by $525 per day, reduced accordingly for those daily tours in which no repair work occurred. Additionally, this Court is of the opinion that the salary of Milton Creel for those tours in which he was engaged simply as a watchman is not a recoverable item.

Accordingly, recovery for this element of repair and salvage operation expenses will be as follows:[11]

REPAIR OPERATIONS

| | | |
|---|---|---:|
| July 30, 1969 | (day and evening tours) | $ 590.00 |
| July 31, 1969 | (day and evening tours) | 590.00 |
| August 1, 1969 | (morning and day tours) | 567.60 |
| August 2, 1969 | (day and evening tours) | 566.00 |
| August 3, 1969 | (day and evening tours) | 591.60 |
| August 4, 1969 | (morning, day and evening tours) | 899.40 |
| August 5, 1969 | (day and evening tours) | 615.60 |
| August 6, 1969 | (morning tour only) | 259.80 |
| | TOTAL | $ 4,680.00 |

SALVAGE OPERATIONS

| | | |
|---|---|---:|
| August 6, 1969 | (day and evening tours) | $ 615.60 |
| August 7, 1969 | (morning, day and evening tours) | 897.80 |
| August 8, 1969 | (morning, day and evening tours) | 899.40 |
| August 9, 1969 through August 18, 1969 | (morning, day and evening tours) | 9,234.00 |
| August 19, 1969 | (morning, day and evening tours) | 899.40 |
| August 20, 1969 | (morning, day and evening tours) | 923.40 |
| August 21, 1969 | (morning, day and evening tours) | 925.00 |
| August 22, 1969 and August 23, 1969 | (morning, day and evening tours) | 1,846.80 |
| August 24, 1969 and August 25, 1969 | (morning, day and evening tours) | 1,798.80 |
| August 26, 1969 through August 30, 1969 | (morning, day and evening tours) | 4,617.00 |
| August 31, 1969 | (morning, day and evening tours) | 875.40 |
| September 2, 1969 | (morning, day and evening tours) | 923.40 |
| | TOTAL | $24,456.00 |

11. See Exhibit P-9.

Additionally, the plaintiff is entitled to recover amounts paid to third parties in connection with the repair and salvage operations. Except for the replacement cost of damaged elevators and elevator bails and one disputed invoice from Patterson Rental Tools, the parties are basically in agreement as to the amounts of each of those recoverable expenses as substantiated by the invoices introduced into evidence as Exhibit P–8. The disputed set of elevators and elevator bails, the cost of which are not shown by invoices, were replaced by an extra set in stock. Byron T. Shows, tool pusher for the plaintiff corporation, testified that the reasonable cost for replacement of these items would be $3,000. Pryor testified, however, that the replacement elevators and elevator bails may have been purchased at an auction by the plaintiff for about $1,000. The Court is of the opinion that the plaintiff has failed to establish a replacement cost for these items of over $1,000 and this amount shall be the allowable expense. Secondly, the rental of a traveling block from Patterson Rental Tools for use in the fishing operations while the damaged traveling block was being repaired is a recoverable expense under salvage operations and will be allowed. Furthermore, this Court finds that the drilling pipe charges of Arrow Trucking Company, Coastal Service Company and Drillco are more properly classified as salvage expenses rather than repair expenses.

Accordingly, recovery for this element of repair and salvage operation expenses will be as follows:[12]

REPAIR OPERATIONS

| | |
|---|---:|
| D. B. "Boot" Smith, Inc. | $ 715.83 |
| Wansley Machine & Welding Service, Inc. | 861.60 |
| Commercial Machine & Welding | 348.17 |
| Lee C. Moore Corporation | 1,649.66 |
| C. L. Smythe Lumber Co., Inc. | 86.85 |
| Armco National Supply Division | 1,041.89 |
| Elevators and Elevator Bails | 1,000.00 |
| TOTAL | $ 5,704.00 |

SALVAGE OPERATIONS

| | |
|---|---:|
| Drillco Oil Tools, Inc. | $ 236.35 |
| Coastal Service Company | 858.32 |
| Arrow Trucking Company | 354.00 |
| The Dia-Log Company | 7,623.00 |
| Tri State Oil Tool Industries, Inc. | 24,648.10 |
| Schlumberger | 516.60 |
| Southland Oil Company | 658.59 |
| Halliburton | 862.84 |
| Patterson Rental Tools, Inc. | 1,503.50 |
| TOTAL | $37,261.30 |

Thus, the plaintiff's total recoverable repair costs is $10,384.00 and the total salvage expense, which must be reduced in accordance with the salvage formula, is $61,717.30.

In order to determine the recoverable salvage expense, it is necessary to compute the proportion that the value of the drill stem below the surface bears to the direct costs of drilling the well plus the value of the drill stem. The undisputed testimony of Pryor reveals that the plaintiff's direct costs to drill a well averaged $80,000. The defendant agrees that this is the correct "first portion of the denominator" in the salvage formula.

The parties are, however, in disagreement as to the value of the drill stem. Pryor testified that there were 22 drill collars worth about $700 apiece and 10,200 feet of drill pipe worth $7.00 or a little less per foot. Thus, he estimated the fair market value of the drill stem on July 30, 1969 to be approximately $86,800. Douglas Henderson, who is employed by Rush Johnson and Associates as an independent appraiser, testified for the defendant that he appraised the rig and the equipment approximately two months after the accident. His inventory of the rig and appraisal, Defendant's Exhibit D–2, reveals that the plaintiff had 10,500 feet of drill pipe worth $6.85 per foot and 20 drill collars worth about $700 each. The Court is of the opinion that the testimony of Pryor more accurately reflects the number of drill collars and footage of drill pipe at the time of the accident. The Court will allow, however, only $6.85 per foot of drill pipe as Pryor did testify that the

12. See Exhibit P–8.

drill pipe was worth $7.00 or a little less per foot. Accordingly, the total value of the drill stem would be $85,270.

It is the contention of the defendant that because the policies exclude coverage for depreciation,[13] the depreciated value of the drill stem below the surface should be utilized in the application of the salvage formula. In his appraisal, Henderson used a 35% depreciation figure on the rig and its equipment which would make the depreciated value of the drill stem $55,425.50.[14] It is unclear from a careful reading of the Salvage Expense Clause, Paragraph 11 of the policies, whether the phrase "value of all drill stem below the surface" requires the application of Paragraph 7(a) and thus the utilization of the depreciated value of the drill stem as the numerator and the second portion of the denominator of the salvage formula.

In light of the heretofore noted well established rule in the State of Mississippi that when the provisions of an insurance policy are subject to equally reasonable interpretations, the interpretation which gives greater indemnity to the insured will prevail, Caldwell v. Hartford Accident & Indemnity Company, *supra*, this Court is of the opinion that the $85,270 value figure should be utilized in the salvage formula. The Court notes, however, that if the $55,-425.50 figure were used in the salvage formula, the recoverable salvage expense would only be reduced by $6,583.65.

■ The recoverable salvage expense in the case sub judice, computed by multiplying the total salvage expense ($61,717.30) by the proportion that the value of the drill stem ($85,270) bears to the direct cost of drilling a well plus the value of the drill stem ($80,000 plus $85,270, or $165,270) is thus $31,842.64.

It is the contention of the defendant that the plaintiff has failed to comply with the Co-Insurance Clause, Article 4 of the insurance policies, which provides:

"Ninety Percent Co-Insurance Clause: The underwriters shall be liable for no greater proportion of any loss than the amount hereby insured bears to 90% of the actual cash value of the property described herein immediately prior to the loss, nor for more than the proportion which this Certificate bears to the total insurance thereon. Each item or rig to be deemed as separate insurance."

Henderson appraised the rig and its equipment some two months after the accident at $612,158.00. Prior thereto, he had examined the rig immediately after the accident and had recommended no coverage because in his opinion the collapse was not due to a "pull-in". As heretofore noted, the insurance afforded by the policies was in the amount of $427,300. The defendant thus contends that under the terms of the Co-Insurance Clause its liability cannot be greater than the amount of insurance ($427,300) bears to 90% of the actual cash value of the property ($550,942 using Henderson's appraisal figure), or 77%. Pryor testified, however, that the $612,150 value figure was extremely exaggerated, and that although the rig was in good condition, it was worth only about $300,000.

■ The Court is of the opinion, having heard the testimony of both of these witnesses and carefully examined the exhibits admitted into evidence, that Henderson's estimated value of the rig is exaggerated and Pryor's estimated value of the rig is understated. It is of course unnecessary for this Court to determine the actual value of the rig. Suffice it to say, however, this Court is convinced that the rig in question was not underinsured to a degree necessary to require any reduction in the recovera-

---

13. Article 7(a) of the insurance policies (Exhibits P–1, 3) states:
   "7. This Certificate does not insure against:
   (a) wear and tear and/or gradual depreciation;"

14. The Court notes that the defendant made a $10,000 error in computing the depreciated value of the drill stem which would reduce the amount it contends the plaintiff is entitled to recover for salvage expense.

ble amount pursuant to the provisions of the Co-Insurance Clause.

Thus, the plaintiff is entitled to recover the sum of $42,226.64 for expenses incurred in the repair and salvage operations. This amount is, however, subject to a deductible of $5,000 under the terms of the policies, leaving a total recoverable sum of $37,226.64.

Finally, the plaintiff contends that it is entitled to recover an attorney's fee under § 5705–19 of the Mississippi Code of 1942, Annotated, which states:

"In any action against an unauthorized foreign or alien insurer upon a contract of insurance issued or delivered in this state to a resident thereof or to a corporation authorized to do business therein, if the insurer has failed for thirty (30) days after demand to the commencement of the action to make payment in accordance with the terms of the contract, and it appears to the court that *such refusal was vexatious and without reasonable cause,* the court may allow to the plaintiff a reasonable attorney fee and include such fee in any judgment that may be rendered in such action. Such fee shall not exceed twenty-five percent (25%) of the amount which the court or jury finds that the plaintiff is entitled to recover against the insurer, but in no event shall such fee be less than twenty-five dollars ($25.-00). Failure of an insurer to defend any such action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause." (Emphasis supplied). .

■ The defendant contends that the plaintiff has failed to prove the insurance policies under consideration herein were issued or delivered in the State of Mississippi or that the defendant's re-

fusal to make payment " * * * was vexatious and without reasonable cause * * *". This Court is of the opinion that the refusal to make payment was not "vexatious and without reasonable cause" and it is thus unnecessary to make any determination of the delivery issue.

Pat Scanlon, a practicing attorney in Jackson, Mississippi, testified for the plaintiff with respect to a reasonable attorney's fee in this case based upon the time records of the plaintiff's attorneys and taking into consideration the fee schedule of the Hinds County Bar Association. Mr. Scanlon stated, however, that the question of coverage involved in this case is a novel and complicated one. Henderson testified that he had investigated approximately four other losses involving a similar factual situation and that the insurers in those lawsuits had taken the same position concerning coverage as the defendant herein. As heretofore noted, Henderson examined the rig immediately subsequent to the accident and recommended no coverage because he felt there was no "collapse due to pull-in".

This Court is of the opinion, considering all the facts and circumstances of this case, that the defendant's refusal to make payment under the policies was not vexatious and without reasonable cause, and the plaintiff is therefore not entitled to recover any attorney's fee pursuant to § 5705–19 of the Mississippi Code of 1942, Annotated.

It is thus the finding of this Court that the plaintiff is entitled to recover the sum of $37,226.64, plus interest to be computed from the date of the Judgment herein,[15] and its costs in this action.

A judgment conforming with the above findings and conclusions shall be presented to the Court, approved as to form by all counsel, within the time and the manner prescribed by the Rules.

15. Lititz Mutual Insurance Company v. Boatner (Supreme Court of Miss.) 254 So.2d 765; Commercial Union Insurance Company v. Byrne, Miss., 248 So.2d 777 (1971).