**Edward OSOSKI, d/b/a Federal Oil Company, Plaintiff,**

**v.**

**ST. PAUL SURPLUS LINES, Defendant.**

No. 00–10026–BC.

United States District Court, E.D. Michigan, Northern Division.

Aug. 6, 2001.

---

William M. McClintic, William M. McClintic, P.C., Mt. Pleasant, MI, for Plaintiff.

Timothy A. Bahorski, Secrest, Wardle, Farmington Hills, MI, for Defendant.

### OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LAWSON, District Judge.

The plaintiff commenced an action in the Isabella County, Michigan Circuit Court against a foreign insurance company seeking recovery under a policy of insurance which the defendant issued to the plaintiff. The policy was intended to reimburse the plaintiff for perils associated with accidental damage suffered during the course of plaintiff's oil well drilling operations. The defendant removed this action to this Court on the basis of the Court's diversity jurisdiction, 28 U.S.C. § 1332, and has now moved for summary judgment. The Court entertained the arguments of the parties through their respective counsel in open court on August 2, 2001. Because the Court determines that the accident in question did not fall within the scope of the covered perils as defined by the policy of insurance, the Court will grant the defendant's motion for summary judgment.

I.

Edward Ososki is an individual doing business as Federal Oil Company (Federal). Federal is in the business of exploring for, developing, and operating oil and gas properties in Michigan. St. Paul Surplus Lines Insurance Company, the defendant (St. Paul), issued policy no. MUO5503076, a policy of Control of Well Insurance, effective between May 2, 1997 and May 2, 1998. The policy defined certain coverages whereby St. Paul would indemnify Federal for verifiable costs incurred in repairing and restoring wells which were damaged by specifically-defined accidental occurrences. The policy provided a combined single limit of two million dollars.

On January 5, 1998, Federal was drilling the Nehez # 1–5HD–1 well (the Well) which, as of that date, had extended horizontally at a measured depth of 6,458 feet and a true vertical depth of 5,964 feet. On that date, Federal discovered that a "traveling block," which is part of the drilling apparatus, was damaged due to a defective, worn or missing bearing. According to *A Primer of Oilwell Drilling,* 5th Ed.,

Rev., Petroleum Extension Serv., Div. of Continuing Educ., Univ. of Tex. at Austin (1996), a traveling block is "an arrangement of pulleys, or sheaves, through which drilling line is reeved and which moves up and down in the derrick or mast." *Id.* The traveling block itself is suspended from a crown block which, in turn, is connected to the top of a derrick which itself rises above ground level at the well head. The traveling block is part of a system of pulleys and wire rope intended to be used as a lifting mechanism.

According to the complaint, Federal attempted to pull up the drilling pipe in order to repair the traveling block. However, during this effort the bearings overheated and the drill line itself was damaged. The damage to the drill line necessitated suspending operations for several hours, during which time the blocks were changed.

While operations were suspended, drill cuttings caused the drill line to become stuck, and efforts to free it were unsuccessful. Consequently, the well had to be capped and side-track drilling operations were commenced. The side-track operations were purportedly intended to restore the well to the condition in which it existed prior to suspending operations to repair or replace the defective traveling block.

On February 13, 1998, while the side-track drilling operations were under way, a below-ground fire or explosion occurred in the well. After considerable damage, the fire was extinguished.

Federal made a claim on its policy of insurance to recover repair and restoration costs in the amount of $572,153.68. St. Paul acknowledged responsibility only for a portion of those costs, and paid Federal the sum of $26,128.13, which also accounted for Federal's self-insured retention in the amount of $25,000.

The Policy contains four sections in which there are grants of coverage. Sections A, B, and C define coverage for circumstances involving a "well out of control." The plaintiff acknowledges that the well in question was not a well out of control as defined by the policy.

The issue presented by this action requires an interpretation of the coverage granted in Section D of the Policy. Section D is a named perils provision which states:

> [St. Paul shall] indemnify the Insured for those authenticated costs and expenses actually incurred to restore or redrill an Insured Well ... which has been physically damaged as a result of physical loss of or damage to the Drilling ... or Production equipment ... or other structure utilized as a foundation for or to support an Insured Well, caused by:
>
> . . . . .
>
> (e) collapse of derrick or mast.... [1]

---

1. The complete Section D reads:

**CONTROL OF WELL INSURANCE**
**SECTION D**
**NAMED PERILS REDRILLING INSURANCE**
In respect of Insured Wells, and in consideration of payment of an additional premium of $*Included*, Section B of this policy, subject always to the terms, conditions and exclusions specifically contained therein, and in addition to Combined Single Limit, retention, terms, conditions and exclusions applicable thereto, is endorsed to indemnify the Insured for those authenticated costs and expenses actually incurred to restore or redrill an Insured Well, or any part thereof, which has been physically damaged as a direct result of physical loss of or damage to the Drilling and/or Workover and/or Production equipment and/or Well jacket, fixed platform or other structure utilized as a foundation for or to support an Insured Well, caused by:
(a) lightning;
(b) fire above the surface of the ground or water bottom;

The plaintiff contends that the January 5, 1998 accident was caused by the collapse of a mast, and therefore falls within the defined scope of coverage in Section D of the Policy. Plaintiff reasons that the traveling block, as part of the lifting mechanism which is the essential purpose of this structure, is an integral part of the mast, and therefore its failure constitutes the failure of the "mast" itself. He further contends that the damage to the bearings in the traveling block so affected its structural integrity that the failure of the block can be characterized as a "collapse."

The Defendant argues that the definition of derrick and mast do not include the traveling block, which is an independent device that can be removed from the structure. The defendant further contends that the mechanical failure of the traveling block or the bearings contained therein cannot fairly be characterized as a "collapse" under any accepted definition of that term.

## II.

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. A party opposing a motion for summary judgment must show by affidavits, depositions, or other factual material that there is "evidence on which the jury could reasonably find for the [non-moving party]."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 253, 106 S.Ct. 2505.

A party may support a motion for summary judgment by demonstrating that an opposite party, after sufficient opportunity for discovery, is unable to meet her burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may not merely rely upon the pleadings to oppose a motion for summary judgment but must come forward with affirmative evidence in the form of materials described in Rule 56(c) to establish a genuine issue on a material fact. *Id.* at 324, 106 S.Ct. 2548. Even in complex cases, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

(c) explosion or implosion above the surface of the ground or water bottom;
(d) collision with land, sea or air conveyance or vehicle;
(e) collapse of derrick or mast;
(f) flood;
(g) strikes, riots, civil commotions or malicious damage;
(h) impact of anchors, chains, trawl boards or fishing nets; and/or
(i) windstorm.
The Company indemnity under this endorsement for authenticated costs and expenses actually incurred shall cease at the time that:

1) the Drilling, Deepening, Completion, Workover, Servicing, Reconditioning, Producing or other operation(s) taking place in the Insured Well immediately prior to the physical damage giving rise to a claim hereunder is resumed, or can be resumed, or
2) the Insured Well is or can be Plugged and Abandoned, whichever shall first occur.
It is expressly understood and agreed that the Company's indemnity does not extend to or include any efforts to re-establish or stimulate production at or to any level, whether or not comparable to that existing prior to the physical damage giving rise to a claim hereunder.

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476–81 (6th Cir. 1989).

In this case, there is no material dispute as to how the accident occurred. Rather, the parties' dispute centers on the interpretation of the insurance contract language and its application to the established facts of the accident.

When presented with a motion for summary judgment, a court can interpret a contract if "(a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir.1999). If the court finds the provision is unambiguous, terms are given their plain and ordinary meaning, and the provision is "enforced as written" at the summary judgment stage. *Id.; Equitable Life Assurance Society of the United States v. Poe*, 143 F.3d 1013, 1016 (6th Cir.1998).

### III.

### A.

As noted above, the defendant has invoked this Court's jurisdiction on the basis of diversity of citizenship. In federal cases based on diversity jurisdiction, the court must apply the law of the state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995) (quoting *Bailey v. V & O*

*Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)). "Relevant data" includes the state's intermediate appellate court decisions, *id.*, as well as the state supreme court's relevant *dicta*, "restatements of law, law review commentaries, and the 'majority rule' among other states." *Angelotta v. American Broad. Corp.*, 820 F.2d 806, 807 (6th Cir.1987).

### B.

Under Michigan law, an insurance policy must be enforced according to its terms. *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 354, 596 N.W.2d 190, 193 (1999). Accordingly, the insurer is not liable for any risk it did not assume. *Id.* An insurer may limit the scope of coverage provided that the policy language leads to only one reasonable interpretation and does not contravene public policy. *Zurich–Am. Ins. Co. v. Amerisure Ins. Co.*, 215 Mich.App. 526, 531, 547 N.W.2d 52, 54 (1996). "Although an insurer is under no duty to specify every conceivable fact situation where coverage will not be provided," the method used should avoid ambiguity. *Kast v. Citizens Mut. Ins. Co.*, 125 Mich.App. 309, 312, 336 N.W.2d 18, 19–20 (1983)(internal quotes omitted). To determine whether an insurance policy covers a particular act, the Court must decide if the occurrence section of the policy includes the particular act, and if so, whether the exclusion section of the policy denies coverage in that case. *Fire Ins. Exch. v. Diehl*, 450 Mich. 678, 683, 545 N.W.2d 602, 605 (1996).

It is the insured who has the burden of proving that his loss falls within a grant of coverage in the policy. *Clark v. Hacker*, 345 Mich. 751, 756, 76 N.W.2d 806, 809 (1956). However, the insurer has the burden of establishing the applicability of an exclusion to coverage. *Roddis Lumber & Veneer Co. v. American Alliance Ins.*

*Co.*, 330 Mich. 81, 88, 47 N.W.2d 23, 26 (1951).

Whether a contract provision is clear or ambiguous is a question of law for the court. *Campbell v. Potash Corp. of Saskatchewan, Inc.*, 238 F.3d 792, 797 (6th Cir.2001); *GenCorp*, 178 F.3d at 817. Contract provisions are ambiguous if they are "reasonably and fairly susceptible to multiple understandings and meanings." *Equitable Life*, 143 F.3d at 1016. Legal ambiguity requires "two or more reasonable interpretations." *GenCorp*, 178 F.3d at 819. Disagreement between the parties does not necessarily constitute ambiguity. *Id.* Likewise, ambiguity does not exist solely because the policy fails to define a term. *Vanguard Ins. Co. v. Racine*, 224 Mich.App. 229, 232–33, 568 N.W.2d 156, 158 (1997). Courts will neither give words a "forced or strained meaning" nor make a new contract under the guise of interpreting a contract. *Edgar's Warehouse, Inc. v. United States Fid. & Guar. Co.*, 375 Mich. 598, 602, 134 N.W.2d 746, 748 (1965). Instead, courts read the entire policy and give each term its commonly understood meaning. *Herman Miller, Inc. v. Travelers Indem. Co.*, 162 F.3d 454, 455 (6th Cir.1998). If the Court finds the contract terms are ambiguous, then the trier of fact determines the intent of the parties and, therefore, summary judgment is inappropriate. *B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d 587, 594 (6th Cir. 2001).

Terms in a particular trade are given their natural and ordinary meaning in that trade. *Cf. Maryland Cas. Co. v. Cassetty*, 119 F.2d 602, 603–04 (6th Cir.1941)(interpreting mercantile contracts). To establish the meaning of a term, the Court may consult specialized dictionaries. *Henderson*, 460 Mich. at 351, 596 N.W.2d at 195.

In this case, coverage depends on the interpretation of two sets of terms: "derrick or mast," and "collapse." Each of the parties offers competing definitions. The plaintiff contends, however, that there is more than one reasonable definition of these terms, which are concededly not defined in the Policy, and therefore a factual dispute exists which precludes summary judgment. The Court will examine each of the terms in turn.

### 1.

The parties have offered various dictionary and technical definitions of "derrick" and "mast." For instance, *A Primer of Oilwell Drilling*, cited by the defendant, defines "derrick" as

> a large load-bearing structure, usually of bolted construction. In drilling, the standard derrick has four legs standing at the corners of the substructure and reaching to the crown block. Compare *mast.*

*A Primer of Oilwell Drilling*, 5th Ed., Rev., Petroleum Extension Serv., Div. of Continuing Educ., Univ. of Tex. at Austin (1996). A "mast" is defined as

> a portable derrick that is capable of being raised as a unit. Compare *derrick.*

*Id.* At oral argument, the plaintiff contended that the structure involved in the accident was a "mast" because it was a portable, temporary structure, a proposition with which the defendant did not quarrel.

A "traveling block" is

> an arrangement of pulleys, or sheaves, through which drilling line is reeved and which moves up and down in the derrick or mast.

*Id.*

St. Paul argues that the failure of the traveling block does not constitute a collapse of the mast because the traveling block can be removed from the mast. However, Federal directs the Court to *America S.W. Corp. v. Underwriters at*

*Lloyds London,* 333 F.Supp. 1333, 1335 (S.D.Miss.1971), in which the Court described the components of a derrick or mast and concluded that "[a] successful drilling operation could not be performed without any one of the above principal and integral parts."

In *America Southwest,* the policy insured "against direct loss or damage by: (1) Raising, lowering, pull-in or collapse, meaning loss or damage caused by collapse due to pull-in." *America S.W.,* 333 F.Supp. at 1335. In that case, the "morning tour driller" mistakenly pulled the fourth joint (three pipes tied together) instead of the third joint. As a result, (1) the traveling block was pulled against the crown block, (2) three sheaves and the crown blocks and sills (designed to protect the crown block) were crushed, (3) the traveling block was broken into pieces, and (4) the monkey board was damaged.

The Court observed that the words "derrick," "mast," "collapse," and "pull-in" were not defined in the insurance policy. The Court, noting that the policy was prepared by the defendant, determined the terms to be ambiguous and stated "this Court finds and is of the opinion that the evidence preponderates in favor of coverage of the damages resulting from this accident of July 30, 1969 . . . ." *Id.* at 1339. It is not clear from the *America Southwest* opinion, however, whether this decision resulted from a motion for summary judgment.

To support its contention that the traveling block is an integral part of the derrick or mast, both parties have submitted affidavits from "experts." Federal submits affidavits from Eddie Terrel and Gyle Atterbury, both drilling consultants. Terrel states, "The traveling block, in my opinion, is an integral part of the derrick/mast and that the breakdown in the traveling block constitutes a collapse of the derrick/mast." Aff. of Terrel, ¶ 9(a). Atterberry's affida-vit states the same opinion. Aff. of Atterberry, ¶ 9(a).

St. Paul submits the affidavit from a lawyer in Louisiana whose purported expertise is the application of insurance coverage to oil-drilling operations. In his opinion, "the 'traveling block' of the drilling rig involved in this case, and indeed any drilling rig, can in no way whatsoever be said to be a part of, much less an integral part of, the 'mast' or 'derrick' of that drilling rig given the well accepted and customary meanings of those terms . . . ." Aff. in Support of Defendant's Mot. for Summ. J., at 3.

 Affidavits may be used to support and oppose a motion for summary judgment and "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Monks v. Gen. Elec. Co.,* 919 F.2d 1189, 1192 (6th Cir.1990). The affidavits make it abundantly clear in this case, however, that the question whether a "mast" includes the lifting mechanism, *i.e.,* the blocks and wire rope, including the traveling block, is open to dispute. Consequently, that term is reasonable susceptible to more than one understanding and is, therefore, ambiguous.

If something is an "integral" part, it is "necessary to the completeness or integrity of the whole." Oxford English Dictionary Online *"integral,* adj.1." (2d ed.1989). Assuming that the traveling block is an integral part of the derrick or mast (viewing the record in a light most favorable to the plaintiff), the affidavits create a "genuine issue of material fact" which precludes summary judgment.

2.

 That does not end the inquiry. For plaintiff to establish that the damage was caused by a covered peril, he must also show that the "mast" "collapse[d]."

Plaintiff contends that "collapse" is susceptible to more than one meaning and does not require a sudden or catastrophic event, as the defendant suggests. Plaintiff relies on two main cases to support its expansive definition of "collapse": *America S.W.* and *Indiana Ins. Co. v. Liaskos,* 297 Ill.App.3d 569, 231 Ill.Dec. 844, 697 N.E.2d 398 (1998).

In *America Southwest,* pulling the wrong joint resulted in the traveling block being pulled against the crown block. Because the drawworks remained in operation, "great and intense pressure" was exerted against the crown block. That pressure crushed the crown bumper block and sills and broke the traveling block into pieces. The heavy pieces of the traveling block fell to the derrick floor, damaging the monkey board on the way down. The elevator and elevator beds also fell to the derrick floor. Because of the force of the heavy falling objects, two of four legs of the derrick collapsed and the entire drilling rig was severely damaged. The Court rejected the narrow interpretation offered by the insurance company that required a complete collapse or toppling to recover under the policy. Instead, it construed the ambiguous language against the insurer and found based on the facts of the case that the structural failure of the derrick constituted a "collapse."

The decision of the Illinois court likewise provides that collapse does not requires a complete falling in or sudden catastrophic occurrence. *Indiana Ins.,* 231 Ill.Dec. 844, 697 N.E.2d at 402. In *Indiana Insurance,* the insurer filed a declaratory judgment action seeking to exclude coverage for damage to the insured's house under the water damage exclusion. The defendant homeowner, in a counterclaim, sought coverage under an exception to the water damage exclusion which extended coverage if water "causes the collapse of a

building or any part of a building." *Id.,* 231 Ill.Dec. 844, 697 N.E.2d at 400. The damage was caused by a slab in the basement floor cracking which allowed water to gush in and fill the basement almost to the floor joists. This caused cracks in the first floor interior walls and exterior masonry and a crater to form in the ground outside the home. It was disputed whether the support structure of the home moved. The trial court denied coverage because the "basement was still cognizable, [the] home had not lost its character and ... there was no collapse within the ordinary meaning of the term 'collapse' because there was no evidence of 'something being up and then something going down.' " *Id.,* 231 Ill.Dec. 844, 697 N.E.2d at 401.

The appellate court, while ultimately denying coverage, held that trial court's definition was too narrow. The Court surveyed courts from several jurisdictions and found the modern view to hold that " 'collapse' is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building." *Id.,* 231 Ill.Dec. 844, 697 N.E.2d at 404 (quoting *Beach v. Middlesex Mut. Assurance. Co.,* 205 Conn. 246, 532 A.2d 1297, 1300 (1987)). It noted that a collapse has been found when a structural falling had not yet occurred but was imminent. *Id.,* 231 Ill. Dec. 844, 697 N.E.2d at 404 (citing *Whispering Creek Condominium Owner Ass'n v. Alaska Nat. Ins. Co.,* 774 P.2d 176 (Alaska 1989)).

The *Indiana Insurance* Court found the term ambiguous because the dictionary definitions made both parties' interpretations reasonable. The plaintiff in the instant case distills from this authority that a reasonable definition of "collapse" is "a breakdown or loss of structural strength." The Oxford English Dictionary defines "collapse" as follows:

"[t]o fall together, as sides of a hollow body;" "to fall into a confused mass or

into a flattened form by loss of rigidity or support;" "to break down, give way, fall in, cave in;" "to shrink suddenly into smaller volume, contract;" "[t]o break down, come to nothing, fail;" and "to lose force suddenly." Oxford English Dictionary Online *"collapse, v.1. & 2."* (2d ed.1989).

As noted above, when interpreting a contract of insurance the court should give a term its commonly understood meaning; however, that meaning should not be forced, strained or result in the creation of a new contract. *Edgar's Warehouse, Inc. v. United States Fid. & Guar. Co., supra.*

Plaintiff argues that the failure of the bearings in the traveling block affected the "structural strength" of the mast, and therefore can be characterized as a "collapse." This Court disagrees. Assuming that the traveling block was an integral part of the mast, the failure of the bearings, which causing a mechanical malfunction, did not affect the structural integrity of the mast itself. Whether sudden or gradual, "collapse" denotes the breakdown or compromise of a physical structure, such that its shape, size or other physical properties are altered. Thus, although courts have broadly defined the term so as not to require the complete demolition of a building, "collapse" nonetheless required a finding that *structural* compromise had occurred or was imminent.

The parties in this case agree that the only failure of the mast assembly was a mechanical failure of the bearings in the traveling block. Although that defect prevented the mast from performing as intended, it did not jeopardize the structure of the mast in any way. The mast did not fall, or distort, or lose its strength. Even accepting plaintiff's argument that the term, "collapse," is susceptible of several meanings, the occurrence in this case did not fall within any one of them. Where the insured's damaging event does not fall within any of several possible definitions of an undefined term within an insurance policy's grant-of-coverage language, no material fact exists and summary judgment is appropriate.

### III.

The Court finds that there is no material factual dispute with respect to the accident in this case and the grant-of-coverage language in the policy. Plaintiff cannot prove that the "occurrence" causing damages fell within the scope of coverage because the mast did not "collapse," under any reasonable and accepted interpretation of that term.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. # 24] is **GRANTED**.