BADGER MUTUAL INSURANCE COMPANY, Plaintiff-Appellee, v. JERRY OSTRY, Defendant-Appellant (Richard Kraemer, Defendant).

First District (5th Division)  No. 1—93—0638

Opinion filed June 3, 1994.

Law Offices of Steven J. Flexman, of Schaumburg (Marian H. Donohue, of counsel), for appellant.

John J. Foley and Tracy E. Stevensen, both of John J. Foley & Associates, of Chicago, for appellee.

JUSTICE McNULTY delivered the opinion of the court:

This declaratory judgment action was brought by plaintiff Badger Mutual Insurance Company (Badger), in order to determine its obligation under its homeowner policy issued to the parents of defendant Richard Kraemer (Kraemer). Badger sought a declaration that it had no duty to defend or indemnify Kraemer in the action brought by Jerry Ostry, after Ostry sustained injuries while a passenger in a boat driven by Kraemer. Badger claimed that Kraemer was engaged in a business pursuit at the time of Ostry's injuries and was therefore not covered by the policy which had a "business pursuit" exclusion clause. In granting summary judgment in Badger's favor and denying Ostry's cross-motion for summary judgment, the trial court held that Badger had no duty to defend or indemnify in the underlying action since Kraemer had been engaged in a business pursuit at the time of the accident. Ostry appeals and we affirm.

The relevant facts as set forth in the deposition transcripts attached to the summary judgment motion are as follows. Steven Miller testified that, in 1989, he was a service manager for Grand Sport and that his father was the president of that company. Grand Sport is in the business of selling and servicing fiberglass inboard boats. Kraemer was a mechanic under Miller's supervision and was required to punch a time clock.

It was not Grand Sport's practice to deliver boats, but Kraemer had informed Miller that if Grand Sport would not deliver a boat, then Kraemer would do so on his own time. When Kraemer delivered a boat on the side, he was compensated directly by the boat owner.

Miller stated that Ostry brought his boat to Grand Sport for service on May 1, 1989. After the work was completed in about three weeks, Miller informed Ostry that it was not Grand Sport's normal practice to deliver boats, but that Kraemer had delivered boats on his own time. Miller stated that Kraemer delivered the boat to Ostry using Kraemer's own truck, towing Ostry's trailer.

Ostry's boat was returned to Grand Sport on June 12, 1989, to have an engine coupler installed. On June 24, 1989, Ostry called and asked Grand Sport to deliver the boat to him. Miller responded that they could not provide the delivery service. Ostry then asked if Kraemer could deliver the boat. Miller informed Ostry that he would leave a note for Kraemer on the chalk board, but that he would not give Ostry Kraemer's home telephone number. Miller left a note, containing Ostry's telephone number, on the chalkboard.

Miller testified that the mechanics had keys to the Grand Sport building and with permission from Miller, his father or his uncle, the mechanics could enter the shop when it was closed in order to get their tools. Kraemer had, at times, done repairs and maintenance on his own boat in the shop, but Miller did not know if Kraemer ever came in on a Sunday to work on the boat. Miller claimed that Kraemer did not have Miller's authorization to enter the padlocked area where Ostry's boat was stored even though he did have a key to the area. Initially, Miller stated that he would have let Kraemer enter the area to deliver Ostry's boat on Sunday if he knew the bill had been paid, but later stated that he would not give Kraemer permission to enter the shop on Sunday even if the bill had been paid. Miller stated that when Kraemer entered the shop on Sunday, June 25, 1989, and took Ostry's boat, Kraemer did not ask for Miller's permission to enter the shop and the entry was unauthorized.

Kraemer stated during his deposition that he had worked as a mechanic for Grand Sport for approximately two years and earned between $10 and $11 an hour. Sometime in May 1989, Ostry brought his boat in for repairs but Kraemer did not work on the boat. Kraemer did not know when Ostry picked up his boat after it was repaired this first time since Kraemer may have been on vacation at that time. Kraemer stated that he was not sure whether he spoke with Ostry when the boat was returned on June 1, nor did he know why the boat had been returned or when the repairs had been completed. Kraemer stated that the boat was brought back a third time for a faulty drive coupler.

Kraemer stated that Grand Sport "sometimes" delivered boats to their owners after the boats had been repaired. Grand Sport would charge between $50 to $100 to deliver a boat. Kraemer stated that

somewhere between 10 and 20 occasions, he delivered new boats while on company time and received no additional compensation for doing so. In addition, Kraemer had on a few occasions entered into side deals where he got paid extra money by delivering a boat to an owner. However, Kraemer could only recall one specific delivery that he had made on his own time. Kraemer testified that when he delivers a new boat, he sometimes takes people out on the lake for a demonstration ride to teach them how to work the controls. This is usually done on company time.

According to Kraemer, he had his own key to Grand Sport and had authorization to be there on Sunday, June 25, for the purpose of waxing his own boat. While he was at Grand Sport that morning, Miller called and asked Kraemer if he would do him a favor and take Ostry's boat down to the lake. Kraemer thought it was his option to determine whether he wanted to deliver the boat. When asked if he was doing the delivery for Grand Sport, Kraemer replied "I was, but I wasn't. I wasn't on the clock, I was waxing my boat, and [Miller] asked me if I would do him a favor and deliver the boat."

Kraemer used his own trailer to deliver Ostry's boat. He was told by Miller to take Ostry's boat to Diversey Harbor, where Ostry would meet him. It was Kraemer's understanding that Ostry would give Kraemer $75 at Diversey Harbor. Ostry never paid Kraemer the $75. It was Kraemer's understanding that he was going to receive the entire $75 and that no part of it was going to go to Grand Sport and that this was fine with Miller. At first, Kraemer did not remember whether the fee arrangement was mentioned in the conversation with Miller or subsequently while conversing with Ostry, but later recalled that Miller had told him that Ostry would pay him $75. Kraemer answered affirmatively when asked if he had considered this delivery an opportunity to make some extra money. When asked if he would have refused to drive the boat down to the lake if he had known that he would not get paid, he responded, "I don't know. I like going down to the lake and stuff ***. Everything doesn't have a price, you know." When asked the same question again, Kraemer responded that he would not have delivered the boat if he was not going to be paid.

Kraemer claimed that he was only supposed to deliver the boat to the Diversey Harbor. Ostry's friend was supposed to meet him at the launch and drive the boat to Ostry's slip in Monroe Harbor. The ramp was very busy and once the boat was put on it, the boat either had to be launched or pulled out. Since Ostry's friend did not show up, and Ostry did not know what to do, Kraemer offered to drive Ostry and the boat to Monroe Harbor. No mention was made of paying

more money to Kraemer for taking the boat to its slip. In fact, Kraemer had never discussed payment with Ostry. Kraemer then explained that while driving the boat to the slip, they hit a wave, and Ostry fell, resulting in a personal injury lawsuit.

Ostry testified that he bought the boat in the fall of 1988 and took it to Grand Sport to see if it was seaworthy. He did not know who worked on his boat at that time. He stated that after he took the boat to Grand Sport, it was there for several months and he never regained possession of the boat. At the time of the accident, the boat was in Kraemer's possession.

Ostry stated that in May 1989, he spoke with someone at Grand Sport regarding the delivery of his boat. The boat was to be delivered to Diversey Harbor and then to Ostry's slip at Monroe Harbor. The person from Grand Sport told Ostry that it was not their practice to deliver boats but he would get some private person to deliver the boat and that person would charge $65. The person from Grand Sport told Ostry that the delivery person would meet Ostry at Diversey Harbor and that Ostry could then go with the delivery person to the slip at Monroe Harbor. Ostry told the person at Grand Sport that he had never operated a motorboat. It was Ostry's understanding that the person who was going to deliver the boat was an employee of Grand Sport but would be delivering the boat as a side job, and Ostry was to pay that person $65. Ostry stated that he told the person at Grand Sport that a friend was going to accompany them on the trip from Diversey Harbor to Monroe Harbor, but that the person who delivered the boat would move it from Diversey Harbor to Monroe Harbor. Ostry stated that he either mailed or dropped off a map of Monroe Harbor showing his slip location and number, or he had told someone at Grand Sport his slip number over the telephone. When Kraemer arrived at Diversey Harbor, he was in a big hurry, put the boat in the water, and told Ostry that he should take it over to Monroe Harbor himself because he had to go back and "get some boat work done." Ostry told Kraemer that he was afraid of having an accident, and that if his friend arrived, the friend could possibly drive the boat over to Monroe Harbor. However, Ostry had understood that Kraemer was supposed to take the boat to Monroe Harbor. Kraemer then agreed to drive the boat to Monroe Harbor. Kraemer did not mention the $65, but said that he would take it over "for that," which Ostry assumed to be $65. Ostry next described the events surrounding the accident injuring him while the boat was being driven to Monroe Harbor.

The trial court granted Badger's motion for summary judgment and denied Ostry's cross-motion for summary judgment, finding that

Kraemer's activities fell within the parameters of the "business pursuits" exclusion and therefore Badger had no duty to defend or indemnify. Ostry filed a timely notice of appeal.

Summary judgment is proper when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.) *De novo* review is appropriate in review of summary judgment rulings. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 607 N.E.2d 1204.

Construction of an insurance policy is a matter of law. (*Kravis v. Smith-Marine, Inc.* (1974), 20 Ill. App. 3d 483, 314 N.E.2d 577.) Terms of an insurance policy must be read according to their plain and ordinary meaning. (*Maryland Casualty Co. v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 150, 466 N.E.2d 1091.) The Badger homeowner's policy issued to Russell and Gladys Kraemer, parents of Richard Kraemer, and insuring relatives who resided in the household, excludes personal liability coverage for bodily injury:

"b. arising out of business pursuits of an insured ***.

This exclusion does not apply to:

(1) activities which are usual to non-business pursuits ***

c. arising out of or rendering professional services ***."

The policy defines "business" as including a "trade, profession or occupation."

■ The sole issue on appeal is whether Kraemer's delivery of Ostry's boat to Monroe Harbor was a business pursuit within the exclusionary clause. A business pursuit is a continuous or regular activity, done for the purpose of returning a profit. (*State Farm Fire & Casualty Co. v. Moore* (1981), 103 Ill. App. 3d 250, 430 N.E.2d 641.) This is true even of part-time or supplemental income activities. *Moore*, 103 Ill. App. 3d at 252.

■ Applying that test to the facts here, we conclude that Kraemer was engaged in a business pursuit at the time of the accident. It is undisputed that Kraemer delivered boats, including Ostry's, for the purpose of obtaining a profit. Kraemer was to be paid either $65 or $75 for delivering Ostry's boat. Kraemer testified that if he had known he was not going to get paid, he would not have delivered Ostry's boat.

Ostry, however, claims that Kraemer did not deliver boats on a continuous or regular basis. We disagree. Although Kraemer was employed full-time as a boat mechanic, he earned supplemental income delivering boats. Kraemer made it known to Miller that he was interested in delivering boats on the side, and that if Grand

Sport chose not to deliver a repaired boat, Kraemer would deliver the boat. Miller referred clients needing delivery service to Kraemer. Kraemer had been employed by Grand Sport for two years. During that time, Kraemer had delivered between 10 and 20 boats while on company time. In addition, Kraemer had delivered boats on the side.

In *Heggen v. Mountain West Farm Bureau Mutual Insurance Co.* (1986), 220 Mont. 398, 715 P.2d 1060, the insured earned from $1,200 to $1,500 annually from fees paid on steer roping contests he held three or four times a year in a permanently designed roping area constructed expressly for the purpose. The court determined that three to four activities a year was "regular" within the meaning of the business pursuits exclusion.

We likewise find that Kraemer's 10 to 20 boat deliveries made while on company time in addition to those deliveries he made on the side during the two-year period in which he worked for Grand Sport constitute regular activity under the business pursuits exclusion. Despite Ostry's urging that we consider only those deliveries made by Kraemer on the side, we see no reason why we should not also take into account those deliveries made by Kraemer while on company time. In concluding that Kraemer's boat deliveries reached the level of regular activity, we recognize that the weather conditions in Chicago limit the boating season to at most six months a year.

Ostry relies on cases where the insured engaged in some part-time activity as a hobby and occasionally earned some money doing so. (See *Southern Guaranty Insurance Co. v. Duncan* (1974), 131 Ga. App. 761, 206 S.E.2d 672 (auto mechanic who raced cars as a hobby was not engaged in a business pursuit when he repaired his race car); *Reinsurance Association v. Patch* (Minn. App. 1986), 383 N.W.2d 708 (machine operator for a construction company was not engaged in a business pursuit when he repaired bicycles in his spare time as a hobby).) Kraemer, in contrast, did not deliver boats as a hobby in his spare time, but rather delivered boats whenever the opportunity arose as a part-time occupation to earn supplemental income.

We also reject Ostry's contention that the business pursuit exclusion does not apply because the activity Kraemer was engaged in at the time of Ostry's injury was an activity ordinarily incident to nonbusiness pursuits. The policy will cover acts which by their nature are not associated with the insured's business pursuits, but which are casually related to the business activities. (*Insurance Co. v. Marko-giannakis* (1989), 188 Ill. App. 3d 643, 544 N.E.2d 1082; *State Farm Fire & Casualty Co. v. Moore* (1981), 103 Ill. App. 3d 250, 430 N.E.2d 641.) What Ostry claims is that driving a boat is a recreational

310

activity and is therefore an activity ordinarily incident to nonbusiness pursuits. However, while driving a boat may be a casual pastime for the general populace, in this instance, it was Kraemer's business to deliver boats and Ostry was injured while Kraemer was carrying out the very act of delivery for which he was hired.

Accordingly, as plaintiff conceded at oral argument that there are no disputed issues of fact, we conclude that the trial court properly granted summary judgment in favor of Badger and properly denied Ostry's cross-motion for summary judgment.

Affirmed.

GORDON and COUSINS, JJ., concur.