THIRD DIVISION

June 24, 1998

No. 1-97-2527

INDIANA INSURANCE COMPANY, )

a Foreign Corporation, )

) APPEAL FROM THE CIRCUIT

Plaintiff/Counter- ) COURT OF COOK COUNTY.

Defendant/Appellee, )

)

v. )

) HONORABLE RONALD RILEY,

JANET F. LIASKOS, ) JUDGE PRESIDING.

)

Defendant/Counter- )

Plaintiff/Appellant. )

JUSTICE GORDON DELIVERED THE OPINION OF THE COURT:

Indiana Insurance Company (Indiana), the plaintiff, brought a declaratory judgment action against its insured, Janet F. Liaskos, the defendant, seeking a declaration that the loss sustained at Liaskos's home was excluded from coverage under the water damage exclusion.  Liaskos filed a four-count counterclaim in which she alleged, 
inter
 
alia
, that her loss was covered under the exception to the water damage exclusion which extended coverage to collapse of a building or part of a building even though caused by water.  At the conclusion of a stipulated bench trial on Indiana's declaratory judgment action, the court entered judgment in favor of Indiana finding that there had been no collapse.  The court also dismissed Liaskos's counterclaims.  Liaskos appeals contending that a collapse can be deemed to occur where a building does not fall or lose its character.  For the reasons discussed below, we affirm.

BACKGROUND FACTS

A.  Insurance Policy Provisions

The homeowners policy issued by Indiana to Liaskos insured against physical loss to the dwelling or structure and damage to personal property in the dwelling.  That policy contained two separate exclusion provisions that dealt with the damage encountered in the instant case.  The first provision, captioned Section 1, Perils Insured Against, stated that the policy did not insure against loss:

"1. caused by:

***

b.  *** pressure or weight to a foundation, retaining wall or bulkhead; ***

* * *

f.  (1)  wear and tear, marring, deterioration;

* * *

    (6)  settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings."

The second provision, captioned Section I, Exclusions, set forth in the policy and various amendatory endorsements, provided in pertinent part as follows:

"SECTION I -- EXCLUSIONS

We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

* * *

3.  
Water Damage
, meaning:

a.  flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

c.  water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.  If such water causes the collapse of a building or any part of a building, we cover loss caused by the collapse.  Collapse does not including [
sic
] settling, cracking, shrinking, bulging or expansion."

The policy also contained a homeowners protective endorsement which covered physical loss caused by sewer back-up subject to a limit of $1,000.  That provision stated:

"
Back-Up of Sewers or Drains.
  We cover direct physical loss caused by water:

a. which backs up through sewers or drains; or

b. which enters into and overflows from within a sump pump, sump pump well or other type of system designed to remove subsurface water which is drained from the foundation area.

This coverage does not apply if the loss is caused by your negligence.

We will pay up to $1,000 on that part of any loss that exceeds $250.  No other deductible applies to this coverage."

II.  Facts

The facts show that at 3:00 a.m. on June 28, 1993, Liaskos awoke to a loud exploding noise.  A slab in the basement floor of her home cracked and pushed up allowing water to gush in, filling the basement almost to the floor joists.  Cracks appeared on the first floor interior walls and on the exterior masonry, and a crater formed in the ground on the outside of the home. 

At the bench trial, the parties waived opening statements and stipulated to the admission as evidence of a videotape of the house taken on August 23, 1993, 72 photographs and two engineers' reports, one from each party.
(footnote: 1)  No testimony was presented.  In the reports which were admitted, experts retained by Indiana and Liaskos agreed that pressure exerted by water below the surface of the ground caused Liaskos's loss.  They disagreed, however, as to whether the support structure of Liaskos's home had moved.  Indiana's consulting engineer concluded that there had been a "hydrostatic upheaval."  He opined that "the structural foundation walls and footings were sound and did not move when the floor heaved up."

Liaskos's structural engineer opined that increased water pressure in the Calumet City sewer system overstressed the plumbing at the insured's property, causing the slab in the basement floor to be "pushed up and cracked" due to water pressure from broken pipes.  In addition, Liaskos's expert stated that a crack was evident in the northwest corner foundation wall, that cracks existed in most door and passageways on the first floor interior and in the exterior masonry adjacent to the front door.  He opined:

"The extreme volume of water that resulted from the plumbing leak also caused some undermining of the footings supporting the columns that support the first floor.  This has resulted in the cracks in the walls on the first floor."

He also opined that the water caused some undermining of the exterior footings near a crater that appeared on the outside northeast corner of the house.  He further opined that "cracking was likely to continue [on the first floor interior walls] until the footings can accommodate the soil readjustment."

After viewing the evidentiary submissions of the parties and listening to their argument, the trial court declared that Liaskos's loss did not meet the collapse exception to the water damage exclusion in the homeowners insurance policy.  In reaching this conclusion, the trial court found that the pictures submitted by the parties showed displacement of concrete on the basement floor and some cracking and settlement causing "structural damage surface-wise, at least, to the home."  The court also found that the basement was still cognizable, that the Liaskos's home had not lost its character and that there was no collapse within the ordinary meaning of the term "collapse" because there was no evidence of "something being up and then something going down."  It ruled that Indiana was not obligated to indemnify Liaskos beyond the $1,000 tendered by Indiana in accordance with the sewer-backup provision of the policy.

DISCUSSION

The sole issue on appeal is whether the loss suffered by Liaskos fell within the collapse exception to the water damage exclusion of the homeowners policy issued by Indiana.  As set forth above, the collapse exception contained in the policy provides coverage for losses sustained when water causes the collapse of a building or any part of the building.  That exception did not define collapse but stated that collapse did not include settling, cracking, shrinking, bulging or expansion.  Also, under a separate provision, captioned Perils Insured Against, the policy stated that it did not insure against loss caused by "settling, cracking *** of foundations, walls, floors, roofs or ceilings."

A.  Rules of Construction and Standard of Review

Under general rules of construction, where policy provisions are unambiguous, the court must give the words of the provisions their plain and ordinary meaning.  
E.g.
, 
Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.
, 166 Ill. 2d 520, 655 N.E.2d 842 (1995); 
Caterpillar, Inc. v. Aetna Casualty & Surety Co.
, 282 Ill. App. 3d 1065, 668 N.E.2d 1152 (1996).  A policy term is not ambiguous simply because a term is not defined within the policy.  
Lapham-Hickey Steel Corp.
, 166 Ill. 2d 520, 655 N.E.2d 842.  In interpreting insurance policies, as with other contracts, policy provisions are ambiguous only if they are subject to more than one reasonable construction.  
E.g.
, 
Dungey v. Haines & Britton, Ltd.
, 155 Ill. 2d 329, 614 N.E.2d 1205 (1993).  Where ambiguous, the terms of a policy must be construed against the drafter of the policy and in favor of the insured.  
E.g.
, 
Bruder v. Country Mutual Insurance Co.
, 156 Ill. 2d 179, 620 N.E.2d 355 (1993); 
Continental Casualty Co. v. McDowell & Colantoni, Ltd.
, 282 Ill. App. 3d 236, 668 N.E.2d 59 (1996).

   If the facts are undisputed, the question of whether they fall within the provisions of an insurance policy is a matter of interpretation and is strictly a question of law for the court to decide.  
United Farm Bureau Mutual Insurance Co. v. Elder
, 86 Ill. 2d 339, 427 N.E.2d 127 (1981); 
Gober v. State Farm Mutual Automobile Insurance Co.
, 263 Ill. App. 3d 846, 636 N.E.2d 1016 (1994).  In that instance, review is 
de
 
novo
.  
E.g.
, 
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992); 
Badger Mutual Insurance Co. v. Ostry
, 264 Ill. App. 3d 303, 636 N.E.2d 956 (1994).  If the facts are also in dispute, a mixed question of fact and law exists.  In that event, the determinations of fact are treated as questions of fact while the determination of the law and its application to the facts are treated as questions of law.  Review of those determinations was explained in 
Joel R. by Salazar v. Board of Education
, 292 Ill. App. 3d 607, 612-13, 686 N.E.2d 650, 655 (1997) as follows:

"[R]eview of a mixed question of law and fact necessitates three steps be taken by the appellate court.  The first step in this process is the establishment of basic, primary or historical facts:  facts in the sense of a recital of external events and the credibility of their narrators.  The second step is the selection of the applicable legal rule.  The third step *** is the application of the law to fact ***.

The appropriate standards of review for the first two of the circuit court's determinations--its establishment of historical facts and its selection of the applicable law--have long been settled.  Questions of fact, whether determined by a jury or by the circuit court in a nonjury case, are reviewed under the deferential, manifest weight of the evidence standard.  [Citation.]  Questions of law are reviewed under the nondeferential, 
de
 
novo
 standard.  [Citation]."

In the instant case, the central issue is the definition of the policy term "collapse," clearly an issue of law.  As shall be seen below, any factual disputes in this case are not outcome determinative because none of the facts would come within any of the definitions of "collapse" proposed by the parties.  Thus, we are faced only with a question of law for which review is 
de
 
novo
.  
Outboard Marine Corp.
, 154 Ill. 2d 90, 607 N.E.2d 1204; 
Joel R. by Salazar
, 292 Ill. App. 3d 607, 686 N.E.2d 650.

B.  Analysis of the Merits

Indiana urges a narrow definition of "collapse" which requires a falling in and reduction of the structure into "a mass of rubbish."  It argues that "collapse" requires a sudden occurrence that causes a structure's basic character to be lost.  In support of this contention for a narrow definition, Indiana relies heavily on the case of 
La Salle National Bank v. American Insurance Co.
, 14 Ill. App. 3d 1027, 303 N.E.2d 770 (1973) wherein the court distinguished between "collapse" and "settling."  The casualty insurance policy in that case insured all risks of direct physical loss or damage from any external cause subject to the exclusions.  Specifically excluded was damage caused by settling of foundations, walls, floors or ceilings.  The policy did not include the term "collapse."  The insured's loss consisted of cracked walls, sinking floors, cracked and sagging ceilings, distorted lintels, shifting of overhead beams and shifting of sinks and urinals mounted on walls.  The insurer denied coverage on the basis that the damage was caused by settling of the building.  The insured argued that the damage was sustained by a sudden collapse.

The trial court rejected the insured's collapse contention finding that there was overwhelming evidence, including the uncontested results of soil borings and the testimony of a single expert witness that the sinking of the floor in the portion of the building was caused by a settling within the meaning of the pertinent exclusionary provision in the policy.  The court stated:

"Plaintiff's argument that the damage was caused by a 'collapse' does not affect this conclusion.  It is not at all clear that characterization of the instant sinking as a collapse would operate to bring the loss within the policy since the underlying cause of such collapse would still be a settling of the supporting soil and with it, a portion of the building's foundation and floors.  
Furthermore, there was no collapse in the instant case.  Illinois law has determined that the expression 'collapse' has a distinctive meaning requiring that the loss be sudden and that the structure's basic character be lost.
  See 
Rubenstein v. Fireman's Fund Ins. Co.
[, 339 Ill. App. 404, 90 N.E.2d 289 (1950)].  This did not occur in the present case."  (Emphasis added.)  
La Salle National Bank
, 14 Ill. App. 3d at 1031-32, 303 N.E.2d at 774.

In 
Rubenstein
, 339 Ill. App. 404, 90 N.E.2d 289 (1950), the case relied upon in 
La Salle National Bank
, a portion of the ceiling in the dining room of the insured's home fell damaging various items of personalty.  The insured's policy excluded from coverage breakage "unless occasioned by *** collapse of building, *** or other similar casualty."  The court affirmed the trial court's ruling denying coverage finding no collapse or other similar casualty.  In so holding, the court defined the term "collapse" as follows:

"In the cases wherein the peril 'collapse of building' has been construed by the courts in various types of policies of insurance, it has been held that the entire building must lose its distinctive character as a building before there is a collapse of the building within the terms of the policy.  *** The court held [in 
Teutonia Ins. Co. v. Bonner
, 81 Ill. App. 231, 236 (1899)] that there was not a fall of a building, or any part thereof, stating *** 'In the text books on insurance, wherever, we find the expression "fallen buildings" or any equivalent expression, it appears that the writer had in mind a building that had fallen "in pieces," "collapsed," or in some form become a "mere ruin," "mass of rubbish," or "a congeries of materials;" that it had become in such condition that it "could not be repaired and still be the same building."'"  
Rubenstein
, 339 Ill. App. at 409-10, 90 N.E.2d at 291-92.

Liaskos seeks to distinguish 
La Salle National Bank
 and 
Rubenstein
 from the instant case based on differing policy language.  She notes that the policy in 
La Salle National Bank
 did not contain the word "collapse" and that the policy in 
Rubenstein
 provided coverage only for "collapse of a building."  She contends that the term "collapse" as used in the policy in the instant case is more expansive because in addition to covering collapse of a building it covers collapse of any part of a building.  Liaskos correctly argues that the narrow interpretation given to the term "collapse" in 
La Salle National Bank
 and 
Rubenstein
, followed by the trial court, is now considered the minority view expressed in older cases.  She urges that this older view be rejected in favor of the newer majority view which finds the term "collapse" is "sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building."  
Beach v. Middlesex Mutual Assurance Co.
, 205 Conn. 246, 252, 532 A.2d 1297, 1300 (1987).

The modern view has been articulated and defined in a series of cases from other jurisdictions.  In 
Beach
 v. Middlesex Mutual Assurance Co.
, 205 Conn. 246, 532 A.2d 1297, for example, the homeowners insurance policy excluded "settling, cracking, shrinkage, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings."  Excepted from that exclusion was "collapse of a building."  The loss sustained in 
Beach
 consisted of a crack in a foundation wall which widened over a period of months causing the wooden support beams on top of the foundation wall to pull apart.  The house never caved in; the plaintiffs continued to reside in the house; and there had never been a sudden catastrophe.  The foundation wall eventually tipped over into the basement and was no longer supporting the house.  The trial referee found that "'[g]iven the state of the structure, eventually the house would have fallen into the cellar.'"  
Beach
, 205 Conn. at 249, 532 A.2d at 1299.  The insurer, relying on the standard dictionary definition of "collapse," denied coverage arguing that the term "collapse" was unambiguous and required a sudden and complete falling in of the structure.

The 
Beach
 court rejected defendant's narrow definition of "collapse" noting that Webster, Third New International Dictionary not only defined "collapse" as a sudden, catastrophic breakdown but also defined it as a breakdown or loss of structural strength.  The court stated:

"If defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended.

*** Read in its entirety, therefore, the defendant's policy does not unambiguously limit its liability to a 'collapse' of a sudden and catastrophic nature.

The result that we reach finds support in the reasoning of other courts.  Although the judicial decisions elsewhere are divided, the more persuasive authorities hold that the term 'collapse' is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building.  [Citations.]  The cases to the contrary, which hold that 'collapse' unmistakably connotes a sudden falling in, loss of shape, or flattening into a mass of rubble, have come to be in the distinct minority.  [Citations.]"  
Beach
, 205 Conn. at 251-52, 532 A.2d at 1300.

Based upon its expanded definition of "collapse," the court found the defendant insurer liable even though there was no sudden catastrophe or actual cave-in and even though the residents remained in the house.  Citing to the trial referee's factual findings, including the fact that the house eventually would have fallen into the cellar, the court found substantial impairment of the structural integrity of the insured's home.  Accord 
Fidelity & Casualty Co. v. Mitchell
, 503 So. 2d 870 (Ala. Civ. App. 1987) (finding collapse where destruction of structural integrity of building when stairway and surrounding area moved eight inches away from primary walls and damage to main body of support such that parts of house would not support weight of a person); 
Whispering Creek Condominium Owner Ass'n v. Alaska National Insurance Co.
, 774 P.2d 176 (Alaska 1989) (finding collapse where ceiling joists had deteriorated and roof in immediate danger of collapse due to hidden decay); 
Campbell v. Norfolk & Dedham Mutual Fire Insurance Co.
, 682 A.2d 933 (R.I. 1996) (applying majority view of collapse where house did not fall but uninhabitable because nineteen-foot section of basement foundation wall crumbled and fell causing unlevel floors and cracked walls in upper part of house).  
Cf
. 
Thornewell v. Indiana Lumbermens Mutual Insurance Co.
, 33 Wis. 2d 344, 147 N.W.2d 317 (1967) (applying broader definition but finding no coverage because bulge in basement wall did not affect structural function or substantially impair structural integrity of home).

It is clear from these cases that under the majority view the term "collapse" does not require complete destruction or falling in of the building or a part thereof nor would it require that the loss result from a sudden catastrophic occurrence.  
Beach
, 205 Conn. 246, 532 A.2d 1297.  A collapse will be deemed to have occurred where a falling in is imminent (
e.g.
, 
Whispering Creek Condominium Owner Ass'n
, 774 P.2d 176) or where there is any substantial impairment of the structural integrity of the building (
e.g.
, 
Mitchell
, 503 So. 2d 870; 
Beach
, 205 Conn. 246, 532 A.2d 1297
).  
Thornewell
, 33 Wis. 2d 344, 147 N.E.2d 317.
  

At this juncture, we note our preference for the majority view rather than the narrow interpretation given by the courts in 
La Salle National Bank
 and 
Rubenstein
.  We are impressed with the fact that substantial impairment to the structural integrity of a building comes within the dictionary definition of the term "collapse" and should be sufficient to trigger coverage under the term "collapse."  To require a complete falling in of a structure gives undue ascendancy to semantic casuistry.  Moreover, given the fact that the dictionary definition of "collapse" makes both parties' interpretations of the term "collapse" reasonable, we, as the court in 
Beach
, find it necessary to adopt the broader definition under the rule of construction that ambiguous policy terms are to be construed against the drafter and in favor of the insured (see 
Bruder
, 156 Ill. 2d 179, 620 N.E.2d 355; 
Continental Casualty Co.
, 282 Ill. App. 3d 236, 668 N.E.2d 59 (ambiguous policy terms are to be construed against the drafter)).  See 
Beach
, 205 Conn. at 250-53, 532 A.2d at 1299-1300 (citing dictionary definitions and finding term "collapse" ambiguous).

We also distinguish 
La Salle National Bank
 on the basis that the policy in that case did not contain the term "collapse" and the court's definition of that term therefore occurred in its dictum.  
Rubenstein
 is distinguished because, unlike the policy in the instant case which covers collapse of part of a building, the policy in that case required collapse of an entire building.  The policy language covering collapse of a building or part of a building exists under newer property damage policies and indicates the insurer's intent to expand coverage.

However, even under the more liberal definition of "collapse" espoused under the majority rule, the facts in the instant case are insufficient.  Here there is no evidence establishing imminent collapse or substantial impairment of the structural integrity of Liaskos's home.  The evidence showed that pressure exerted by water below the surface of the ground caused a basement slab to crack and push up allowing water to gush into the basement.  According to Liaskos's expert, a crack was evident in the north and west foundation wall, cracks occurred in the exterior masonry wall adjacent to the front door and in the interior door and passageways in the first floor.  He opined that cracks in the exterior masonry and in the first floor were caused by some undermining in the footings supporting the columns that supported the first floor and some undermining of the exterior footings.  Liaskos's expert also opined that the cracking on the first floor would continue until the footings could accommodate the soil readjustment.  The insurer's expert engineer disagreed as to whether there had been movement in the foundation.  He opined that "the structural foundation walls and footings were sound and did not move when the floor heaved up."

While the evidence is contradictory as to whether the footings moved, the factual determination of that conflict is not dispositive since neither expert concluded that the structural foundation was unsound or that there was a breakdown or loss of structural strength in Liaskos's home.  At best, the reports of the experts and the pictures in the supplemental record established that there was a shifting of the footings which caused minor cracks in the exterior masonry near the front door, the walls of the interior doorways and a crack in the north and west corner of the basement well.  The evidence did not suggest that any of the cracks, especially the crack in the basement foundation wall, had widened or would continue to widen over time.  The evidence did not show that the basement foundation wall had moved and separated from the rest of the foundation, that it was no longer supporting Liaskos's home or that its movement caused Liaskos's home to be uninhabitable.  See 
Thornewell
, 33 Wis. 2d 344, 147 N.E.2d 317 (applying majority view but finding that bulge in basement wall did not materially impair basic structure or substantial integrity; wall could perform its structural function).  This is to be contrasted with the facts in 
Campbell
, 682 A.2d 933, wherein the basement foundation wall crumbled causing the house to shift, the floors to become unlevel and the house to become uninhabitable; in 
Whispering Creek Condominium Owner Ass'n
, 774 P.2d 176, wherein the ceiling joists had deteriorated and the roof was in immediate danger of collapse; in 
Beach
, 205 Conn. 246, 532 A.2d 1297, where the basement foundation was no longer supporting the house and where the house eventually would have fallen into the basement; and in 
Mitchell
, 503 So. 2d 870, where the staircase had separated from the primary walls, the main body of support was damaged and parts of the house could not support the weight of a person.  In reaching this conclusion, we reject Liaskos's contention that collapse is established by the fact that her home was rendered uninhabitable one day after the occurrence.  While uninhabitability is a factor to be considered in determining whether a collapse occurred, the uninhabitability must be due to the soundness of the structure of the building.  See, 
Campbell
, 682 P.2d 933.  
Cf.
 
Whispering Creek Condominium Owner Assoc.
, 774 P.2d 176 (where abatement notice issued by governmental agency due to imminent danger of roof falling).  The record shows that the uninhabitability of Liaskos's home was not due to a structural impediment but due to a temporary presence of water and lack of electrical power.

Moreover, to extend coverage in the instant case where there is no substantial impairment but mere cracking not only fails to comport with the definition of "collapse" even under the more liberal modern view but would do violence to the explicit language of the policy which excludes loss caused by "settling, cracking, shrinking, bulging or expansion of *** foundations, walls, floors, roofs or ceilings."  The denial of coverage for settling and cracking was specifically reaffirmed in the policy in connection with the water damage exclusion wherein the policy recited that collapse, as an exception to that exclusion, did not include "settling, cracking, shrinking, bulging or expansion."  While we do believe that the exclusions for cracking would not preclude coverage when that cracking causes substantial impairment to the structural integrity of a building or part of a building,
(footnote: 2) those exclusions would most certainly preclude coverage in the instant case where the cracking was not shown to affect the structural integrity of defendant's home.

For the foregoing reasons, we affirm the judgment of the Circuit Court of Cook County.

Affirmed.

LEAVITT, P.J. and BURKE, J., concur.

FOOTNOTES
1:
Neither the videotape nor most of the photographs submitted to the trial court were included in the record on appeal.  In a motion taken with the case, Liaskos moved to supplement the record with 14 photographs, labeled Trial Exhibits 2 through 9, which were reviewed by the trial court.  Those exhibits were represented as photographs taken by Indiana's adjuster.  We grant Liaskos's motion to supplement the record as well as her motion to file her reply brief instanter.

2:
Along these lines, we note that the policies 
in 
Whispering Creek Condominium Owner Ass'n
, 774 P.2d 176, and 
Thornewell
, 33 Wis. 2d 344, 147 N.W.2d 317, contained no exclusion for settling, cracking, shrinking, bulging or expansion.  The policies in 
Mitchell
, 503 So. 2d 870, and 
Campbell
, 682 A.2d 933, like the policy in the instant case, stated that collapse did not include settling, cracking, shrinking, bulging or expansion.  However, the losses for which coverage was sought in those cases did not involve any of those excluded conditions.  The policy interpreted in 
Beach
 contained an exclusion for "settling, cracking, shrinkage, bulging or expansion of *** foundations, walls, floors, roofs or ceilings."  That exclusion was followed by modifying language stating "unless *** collapse of a building *** not otherwise excluded ensues."  
Beach
, 205 Conn. at 250, 532 A.2d at 1299.  The 
Beach
 court 
construed that provision "to exclude loss related to 'settling, cracking, shrinkage, bulging or expansion,' only so long as 'collapse' does not ensue."  
Beach
, 205 Conn. at 251, 532 A.2d at 1300.