INSURANCE COMPANY OF ILLINOIS, Plaintiff-Appellant, v. DENNIS BROWN et al., Defendants-Appellees.

First District (6th Division)   No. 1—99—0373

Opinion filed August 4, 2000.

Kilgallon & Carlson, of Chicago (Keith G. Carlson, of counsel), for appellant.

Corboy & Demetrio, P.C., of Chicago (Philip H. Corboy and Michael G. Mahoney, of counsel), for appellees Dennis Brown, Victor Brown, and Diane Brown.

Cassiday Schade & Gloor, of Chicago (John D. Hackett, Donald F. Ivansek, and Deborah Caldwell-Stone, of counsel), for appellee Potomac Insurance Company of Illinois.

JUSTICE CAMPBELL delivered the opinion of the court:

This is a dispute among insurance companies. Plaintiff, Insurance Company of Illinois (ICI), filed a declaratory action against Potomac Insurance Company of Illinois (Potomac), American Service Insurance Company (American Service), and Victor, Diane and Dennis Brown, the insureds (collectively, defendants), under ICI's policy, seeking a declaration that it owed no coverage to Dennis Brown for injuries he sustained while riding as a passenger in a vehicle driven by an uninsured motorist. ICI and defendants filed cross-motions for summary judgment, and the circuit court of Cook County entered judgment in favor of defendants and against ICI, holding that all three policies provided uninsured motorist coverage to Dennis Brown up to a combined maximum of $500,000, to be contributed by each insurer on a *pro rata* basis.

On appeal, ICI contends that the trial court erred in determining that ICI owed coverage to the Browns for Dennis' accident on the following bases: (1) the Browns' coverage under the ICI policy lapsed as a result of automatic termination; (2) the "known loss" doctrine prevents coverage for an occurrence that takes place at the end of the policy period; and (3) the ICI policy was properly rescinded due to ma-

terial omissions by the Browns. For the following reasons, we affirm the judgment of the trial court.

BACKGROUND

The following facts are relevant to this appeal. In June 1993, Victor and Diane Brown (the Browns) were insured under an automobile liability policy issued by ICI. The Browns' son, Dennis, owned his own automobile, a Ford Mustang, which was insured under a separate liability policy issued by American Service. The Browns' policy with ICI was due to be renewed, and sometime in June 1993, the Browns received a renewal notice and invoice from ICI for a premium of $2,127.

At a discovery deposition, Diane testified that out of concern about the increased cost of the policy premium, she began to investigate alternative automobile insurance. Diane obtained a quote from General Accident Insurance Company (General Accident) through Mary Janet Keaskowski, an insurance agent with the firm Drost, Schultz & Pohl. On June 17, 1993, Diane applied for a new insurance policy with General Accident. Diane completed a written application and mailed it to Keaskowski with a check in the amount of $329.50, representing the deposit premium for the proposed new policy.

On June 21, 1993, Keaskowski issued an insurance binder to extend temporary automobile liability coverage to the Browns for their two vehicles, a 1990 Buick Le Sabre and a 1990 Volkswagen Golf. The binder provided coverage through Potomac, a subsidiary of General Accident, beginning on June 20, 1993, and terminating on July 20, 1993. The coverage limits shown on the face of the binder included $500,000 for liability, $5,000 for medical payments, and $500,000 for uninsured motorist coverage. The binder also extended coverage for physical damage to the Browns' vehicles, subject to a $500 deductible, $300 higher than the deductible contained in the ICI policy.

Keaskowski testified that she limited the effective period of coverage afforded by the binder to one month because she believed it was contrary to law to write an insurance binder for any period longer than one month. Keaskowski stated that, prior to the end of the one-month period of the binder, the actual policy is customarily issued by the insurance company. In this case, the Browns' policy was to be for a period of six months. Diane testified that, based on her understanding of the above-described custom, she did not cancel the ICI policy upon obtaining the Potomac binder.

On June 24, 1993, Dennis Brown was seriously injured when the automobile he was riding in as a passenger collided with an automobile driven by Ramiro Morales. Diane testified that she did not immediately

report the accident to either ICI or Potomac because she was attending to the seriousness of Dennis' condition. On the date of Dennis' accident, Potomac had not yet issued its actual policy to the Browns.

On July 8, 1993, Diane received a cancellation notice from ICI. The notice stated that the premium due on the Browns' automobile liability policy on June 28, 1993, had not been received and that the policy would lapse on July 25, 1993, unless the Browns sent payment in the amount of $878.32, to ICI prior to that date. The notice stated: "If the premium is received before the cancellation effective date shown above [July 25, 1993], we will be able to continue your insurance coverage without interruption." On July 16, 1993, Diane wrote and mailed a check for $878.32 to ICI.

ICI renewed the Browns' automobile policy number 13—12—011201—2 (ICI policy), effective May 24, 1993. The declarations page identified the policy as a renewal policy and provided coverage for the Browns' two vehicles for the period June 20, 1993, to December 20, 1993. Coverages afforded by the policy included liability limited to $500,000, uninsured and underinsured motorist and bodily injury up to a limit of $500,000, excess medical expenses limited to $5,000, and replacement costs for property damage to each vehicle, subject to a $200 deductible. Under the terms of the policy, the uninsured and underinsured motorists' coverage extended to any family member who resided in the Browns' household.

The policy contained the following provision, entitled "Automatic Termination," as follows:

"If you obtain other insurance on 'your covered auto,' any similar insurance provided by this policy will terminate as to that auto on the effective date of the other insurance."

The policy was amended in January 1992 to include the following provision regarding uninsured motorist coverage:

"Part C—Uninsured Motorist and Underinsured Motorist Coverage. Under INSURING AGREEMENT, Part A. of Uninsured Motorists Coverage, the following sentence is added:

Any claim for damages under this coverage must be presented to us within two (2) years of the date of the accident.

Under INSURING AGREEMENT, Part A. of Underinsured Motorists Coverage, the following sentence is added:

Any claim for damages under this coverage must be presented to us within two (2) years from the date of judgment, fulfillment of the exhaustion clause, or other indication of underinsured loss."

On July 13, 1993, Keaskowski mailed an automobile liability policy issued by Potomac to the Browns. The Potomac policy, number RPA

1014018—5 (Potomac policy), extended coverage to the Browns and their vehicles from June 20, 1993, through December 20, 1993. The coverages were subject to the following limits of liability: $500,000 for liability, $5,000 for medical payments, and $500,000, for uninsured motorist coverage, with a $500 deductible for property damage to the covered vehicles.

On September 3, 1993, Alina Koester of American Service Insurance Company (American Service), sent a medical authorization form to the Browns in response to their report concerning Dennis' accident of June 24, 1993. On October 2, 1993, Diane sent ICI a check for $608.50, representing the second installment of the premium due ICI for the Browns' automobile policy. Subsequently, on October 15, 1993, ICI canceled the policy at Diane's request, retaining the premium of $878.50 paid by Diane on July 16, 1993, and refunding the amount of $608.50, which Diane paid on October 2, 1993.

After Dennis' accident, the Browns discovered that the driver of the vehicle in which Dennis was an occupant was uninsured. The Browns also learned that Morales' automobile policy, issued through American Service, limited coverage to $20,000, per person and $40,000 per occurrence. By correspondence dated January 5, 1995, Browns' counsel, Corboy and Demetrio, formally notified ICI, Potomac and American Service of Dennis' intent to seek coverage under the uninsured motorists' provisions of each insurance company's respective policies.

On August 5, 1995, ICI filed its complaint for declaratory judgment against the Browns, Potomac, and American Service, seeking a declaration that it owed no uninsured motorist coverage to Dennis Brown. ICI subsequently filed a motion for summary judgment and Potomac, American Service and the Browns filed cross-motions for summary judgment. On December 22, 1998, the trial court denied ICI's motion and granted the cross-motions in favor of the Browns, Potomac, and American Service, specially finding that uninsured motorist coverage existed under all three policies of insurance to a maximum of $500,000, to be allocated on a *pro rata* basis among the three insurers. ICI filed its timely notice of appeal on January 20, 1999.

OPINION

Initially, ICI contends that the trial court erred in determining that the ICI policy provided coverage for Dennis' accident. ICI argues that the Browns' policy lapsed as a result of automatic termination.

Our review of the construction of an insurance policy on summary judgment is *de novo*. *Indiana Insurance Co. v. Liaskos*, 297 Ill. App. 3d

569, 574, 697 N.E.2d 398, 402 (1998). The only issue before this court is whether all the pleadings, depositions, admissions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005 (West 1998); *Caterpillar, Inc. v. Aetna Casualty & Surety Co.*, 282 Ill. App. 3d 1065, 1068, 668 N.E.2d 1152, 1154 (1996).

ICI argues that the automatic termination clause of the Browns' policy, *i.e.*, "If you obtain other insurance on 'your covered auto,' any similar insurance provided by this policy will terminate as to that auto on the effective date of the other insurance," clearly and unambiguously provides that if similar automobile insurance is procured, the ICI policy will terminate.

██ ██ The language of an insurance policy is considered ambiguous when capable of more than one construction, both of which are reasonable. *Bruder v. Country Mutual Insurance Co.*, 156 Ill. 2d 179, 193, 620 N.E.2d 355, 362 (1993). Our supreme court has held that provisions of an insurance policy that limit or exclude coverage, such as an automatic termination clause, are to be interpreted liberally in favor of the insured and against the insurer. *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479, 687 N.E.2d 72, 75 (1997). Here, because the ICI policy does not define "similar insurance," a term that is susceptible to more than one reasonable interpretation, the term is rendered inherently ambiguous.

While our supreme court has specifically rejected the notion of automatic "cancellation by substitution," holding that an insured's subjective intent to cancel an insurance policy could not, standing alone, effect a cancellation of the insurance policy (*Copley v. Pekin Insurance Co.*, 111 Ill. 2d 76, 85, 488 N.E.2d 1004, 1008 (1986)), the interpretation of the "automatic termination" provision is a question of first impression in Illinois. Without established authority in Illinois, this court may choose to examine authority outside our jurisdiction to aid our interpretation of the insurance contract provision. *Pekin Insurance Co. v. Benson*, 306 Ill. App. 3d 367, 374, 714 N.E.2d 559 (1999).

Both parties direct this court to out-of-state authority in support of their respective positions. ICI relies primarily on the Washington State case *Taxter v. Safeco Insurance Co.*, 44 Wash. App. 121, 721 P.2d 972 (1986), which upheld and enforced an identical automatic termination clause contained in an automobile insurance policy. *Taxter* is distinguishable from the present case, however, in that the *Taxter* plaintiffs were in receipt of an actual second policy of insurance at the time they made their claim. Here, the Browns possessed a mere binder of temporary insurance from Potomac at the time they made their claim, as opposed to an actual second policy of insurance.

■ As for the meaning of a temporary binder of insurance, we find instructive the Kentucky case of *General Accident Insurance Co. of America v. Guess*, 936 S.W.2d 97 (Ky. App. 1997). Under Kentucky law, a binder is "generally issued as a temporary arrangement to provide immediate coverage until a permanent policy can be obtained." *Guess*, 936 S.W.2d at 99; see also 43 Am. Jur. 2d *Insurance* § 219 (1982) (binder is a memorandum of agreement intended to give temporary protection pending investigation of risk and issuance of policy). Our own supreme court has found an insurance binder to be "in the nature of temporary insurance." *Zannini v. Reliance Insurance Co. of Illinois, Inc.*, 147 Ill. 2d 437, 590 N.E.2d 457 (1992).

The California courts similarly find that a binder alone does not constitute an insurance policy; it is only an independent contract separate from the actual policy that is intended to provide temporary protection pending investigation of the risk by the insurer and until issuance of the policy by the insurer or rejection. One court describes the sole purpose of a binder as to serve as evidence "that the policy has not yet been issued since the binder is effective until either the insurance application is rejected or the policy is issued." *Ahern v. Dillenback*, 1 Cal. App. 4th 36, 48, 1 Cal Rptr. 2d 339, 346 (1991). We adopt the holdings of the other jurisdictions and find that a binder of insurance is temporary and therefore not comparable to an actual policy of insurance.

Our holding is consistent with the pubic policy concerns of this state: to allow a temporary binder of insurance to cancel an insurance policy that is already in effect would be contrary to public policy favoring vehicle safety. In Illinois, all persons who operate a motor vehicle are required by law to maintain automobile insurance (625 ILCS 5/7—602 (West 1998)), and persons who fail to maintain such insurance are subject to substantial penalties. See, *e.g.*, 625 ILCS 5/3—707 (West 1998) (setting forth penalties ranging from $500 to $1,000 for operating a motor vehicle without insurance). Upon issuance of a temporary binder, an insurer is under no obligation to issue a subsequent policy of insurance or to accept full responsibility for the risk. By the same token, the insured is not obligated to accept the permanent policy solely because a binder has been issued. Thus, if we were to hold that the issuance of a binder effectively canceled a preexisting policy pursuant to an automatic termination clause, such as the one contained in ICI's policy here, the holder of the binder could find himself or herself without any automobile coverage whatsoever in the event that a permanent policy was not issued and thereby subject to both civil and criminal penalties. We conclude that the temporary binder of insurance obtained by the Browns from Potomac did not effect an automatic cancellation of the ICI policy.

■ We further find that ICI has by its own actions waived any argument that its policy was not in force on the date of Dennis' accident. Waiver arises from an affirmative act by the insurer, which consists of an intentional relinquishment of a known right. *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 499, 475 N.E.2d 872, 878 (1985). The record shows that the Browns obtained a temporary binder of insurance from Potomac on June 20, 1993. It is undisputed that ICI sent Diane a notice of cancellation on or about July 8, 1993, which contained an offer to continue the Browns' insurance without interruption, if the Browns remitted a premium payment in the amount of $878.72 by July 25, 1993. Diane paid the said premium on July 16, 1993, and remitted a second payment in the amount of $608.50 on October 2, 1993. The record shows that ICI retained both premium payments through October 15, 1993, the date upon which the policy is stamped terminated. On that date, ICI refunded one premium payment in the amount of $608.50 until October 15, 1993, but at no time refunded the payment of $878.72. ICI has thereby acknowledged that its policy was in effect for the period which includes the date of Dennis' accident and has waived any policy defense concerning cancellation of the Browns' policy.

■ ICI further argues that, even if the automatic termination clause is inapplicable, the trial court should have found that the Browns are barred from recovering on the ICI policy because Dennis' injury was a "known loss" that the Browns misrepresented to ICI at the time of renewal. ICI argues that the loss occurred prior to the "effective date" of the ICI policy, July 16, 1993, the day the Browns paid the renewal premium, and therefore the Browns are not covered under the policy.

ICI's argument is unavailing. The record shows that on or about July 8, 1993, Diane Brown received a "Notice of Cancellation" from ICI which provided as follows:

> "You are a valued customer, and we hope this reminder will help prevent a lapse in your insurance coverage. If payment has been made, please disregard this notice.
>
> Because we have not received payment of the premium due, the policy will be canceled and all liability cease on 7—25—93, at the hour on which said policy became effective. No further notices will be sent.
>
> $878.72 was due the company on 06—28—93.
>
> In case payment was overlooked, there is still time to send it to: American States Group, P.O. Box 140, Indianapolis, Indiana 46206.
>
> If the premium is received before the cancellation date shown above, we will be able to continue your coverage without interruption."

Diane Brown sent a check for $878.72 to ICI on approximately July 16, 1993, prior to the stated cancellation date of July 25, 1993. The ICI policy did not expire on June 20,1993, but, as shown in the cancellation notice above, continued *uninterrupted* until October 15, 1993, the date the Browns canceled the policy.

■ Finally, ICI contends that the trial court erred in failing to rescind the ICI policy based on the Browns' intentional misrepresentations. ICI argues that the Browns' failure to disclose to ICI the fact of Dennis' accident prior to renewal constitutes a material misrepresentation of fact rendering the policy void.

ICI's argument is without merit. By the terms of ICI's renewal offer, the Browns were obligated to render payment of the premium prior to the cancellation date of July 25, 1993, in order to *continue* coverage under the ICI policy. This case is not comparable to *Carroll v. Preferred Risk Insurance Co.*, 34 Ill. 2d 310, 215 N.E.2d 801 (1966), cited by ICI. There, our supreme court found that in a situation where an applicant for a *new* policy of insurance failed to disclose material facts at the time of applications, coverage was properly denied.

Under the facts and circumstances of this case, we find that the trial court properly entered summery judgment in favor of defendants and affirm the order of the trial court.

Affirmed.

ZWICK, P.J., and BUCKLEY, J., concur.